**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

ADAM THOR, et al,                                    CASE NO. 1:24-cv-23772-PCH

       Plaintiffs,

v.                                                                  Hon. Paul C. Huck

FRONTIER AIRLINES, INC.,

       Defendant.

_____/

## DEFENDANT FRONTIER AIRLINES, INC.'S MOTION TO DISMISS WITH MEMORANDUM OF LAW

Defendant, Frontier Airlines, Inc. ("Frontier"), by its undersigned counsel, moves to dismiss Plaintiffs' Complaint at Law pursuant to Federal Rules of Civil Procedure 12(b)(6), and in support thereof states as follows:

## I.    INTRODUCTION

Plaintiffs Adam Thor and Travis Foster ("Plaintiffs") filed a Complaint alleging that Frontier removed them from their original flight and transported them on a later flight. They attempt to bring claims for deceptive or misleading practices pursuant to Florida state law, breach of contract, fraudulent misrepresentation, and racial/religious discrimination pursuant to the Florida Civil Rights Act. Plaintiffs' claims, however, are barred by the application of the Montreal Convention.  Alternatively, Plaintiffs fail to plead sufficient facts to support their state law causes of action. Because Plaintiffs cannot plead viable claims under any circumstances, the Court should dismiss their Complaint with prejudice.

## II.    BACKGROUND

Plaintiffs' first claim alleges deceptive or misleading practices in violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), for engaging "in conduct of unconscionable acts or practices in a manner which was materially deceptive and misleading . . ." (See Plaintiffs' Complaint at p. 6, attached as Exhibit A). Plaintiffs' second claim alleges that Frontier committed a breach of contract by having "represented a specific flight time and date and then after the purchase of the ticket this time changed forcing the Plaintiff's (sic) to be stuck with that new time frame with no other options." *Id*. at 7. Their third claim alleges fraudulent misrepresentation, asserting that Frontier "induc[ed] the Plaintiffs to purchase tickets and throughout the contractual relationship…made numerous representations that were materially false…having a flight attendant lie to a pilot…and having a second flight attendant participant (sic) in the same misrepresentations." *Id*. at 8. Finally, Plaintiffs claim that Frontier violated the Florida Civil Rights Act by discriminating against them based on religion and race. *Id.* at 9.

In support of their claims, Plaintiffs allege that on November 2, 2023, Plaintiffs purchased tickets for air transportation from Guatemala City (GUA) to Miami, Florida (MIA), scheduled to depart on January 11, 2024, at 1:57 pm and arrive at 5:34 pm. *Id*. at 2. Later that same month, Frontier rescheduled the departure time to 2:23 am and arrival time to 6:02 am. *Id*. After boarding their originally scheduled flight, Plaintiffs engaged with several passengers, as well as flight attendants. *Id*. As the aircraft was taxiing prior to takeoff, and after all passengers were required to fasten their seatbelts (14 CFR 91.517), a flight attendant approached Plaintiff Thor and asked him to fasten his seatbelt. *Id*. at 3. Plaintiff Thor responded facetiously that he "didn't know how to put on the seatbelt and needed help." *Id*. At that point, the flight attendant walked away to seek the assistance of another flight attendant. *Id*. When the senior flight attendant approached the

Plaintiffs, she addressed Plaintiff Foster and asked if Plaintiffs were going to be a problem during the flight. *Id.* Plaintiff Thor stated that "we won't be a problem, and everything is fine." *Id.* The flight attendant then informed Plaintiffs that she had been notified that they were refusing to put their seatbelts on and were bothering other passengers. *Id.* The situation escalated, and Plaintiffs accused the flight attendant of discrimination, while the flight attendant accused Plaintiffs of threatening her. *Id*. at 4.

The aircraft then taxied back to the gate and agents asked Plaintiffs to exit the aircraft. *Id.* at 4-5. After deplaning, Plaintiffs were questioned about the incident, and they were informed that a flight attendant had requested that the flight return to the gate for Plaintiffs' removal. *Id*. at 5. While being questioned in the gate area, the flight departed without Plaintiffs. *Id*. Once questioning ended, Frontier re-booked Plaintiffs on the next flight to their destination at no charge, which departed at 2:21 am the following morning. *Id.* Plaintiffs ultimately boarded their replacement flight and were successfully transported to their destination without any issues. *Id*. at 6.

### III.    LEGAL STANDARD

A defendant may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal citations omitted). The federal pleading standard demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation. *Twombly*, 550 U.S. at 555. The factual allegations must go beyond the sheer possibility that a defendant has acted unlawfully. *Id.* at 557.

## IV.     <u>ARGUMENT</u>

As *pro se* litigants, Plaintiffs' pleadings "are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). However, this does not authorize a court to "serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." *Trimble v. Fort Valley State Univ.*, 2024 U.S. App. LEXIS 7063, at *8 (11th Cir. 2024). Like any other litigant, a *pro se* plaintiff must meet the pleading standards of FRCP Rule 8 and the plausibility standard of *Twombly* and *Iqbal* to avoid dismissal under Rule 12(b)(6). *Id.* at *9.

### A.     **Plaintiffs' claims are barred by the Montreal Convention.**

The Montreal Convention governs the rights and liabilities of air carriers in "persons, baggage, or cargo." Convention for the Unification of Certain Rules for International Carriage by Air (hereinafter "Montreal Convention" or "Convention"), Art. 1(1), May 28, 1999, S. Treaty Doc. No. 106-45, 2242 U.N.T.S. 350. The treaty is controlling when the plaintiff engages in "international carriage," which is defined as: "any carriage in which . . . the place of departure and the place of destination, whether or not there be a break in the carriage, are situated either within the territories of two States Parties, or within the territory of a single State Party if there is an agreed stopping place within the territory of another State, even if that State is not a State Party." *Id.* at Art. 1(2). The Montreal Convention is the sole grounds for carrier liability in such circumstances when the claim involves death, bodily injury, damage to passenger baggage, or damage associated with a delay in the air carriage of passengers, even if the claims are not cognizable (*i.e.,* even if they do not satisfy the conditions for liability) under the

Convention. See *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 161, 119 S. Ct. 662, 142 L. Ed. 2d 576 (1999); *Cavalieri v. Avior Airlines C.A*., 2022 U.S. Dist. LEXIS 242573, at *15-16 (S.D. Fla. Nov. 14, 2022).

Here, Plaintiffs attempt to bring state law claims related to their international flight from Guatemala City, Guatemala to Miami, Florida. All of their claims, however, are preempted by the Montreal Convention. See *Carias v. Am. Airlines, Inc.,* 2023 U.S. Dist. LEXIS 178680, *11-12 (S.D.Fla 2023)(recognizing that the Eleventh Circuit has enforced the Montreal Convention's preemptive effect by dismissing the state-law claims of international-air plaintiffs). In applying the Montreal Convention, Plaintiffs cannot recover under Article 19 because they allege only non-economic damages, which are not recoverable pursuant to a delay claim. See *AGC, LLC v. Centurion Air Cargo, Inc*., 2015 U.S. Dist. LEXIS 127496, *6-7 (S.D. FL 2015). Additionally, they cannot recover under Article 17 of the Convention because their claims do not arise out of an "accident," and they allege purely emotional distress injuries, which are not recoverable under Article 17. Finally, Plaintiffs' punitive damages claims are explicitly barred by Article 29 of the Convention.

  1. <u>Article 19</u>

Courts have routinely held that claims based on an airline's removal of a passenger from an international flight sounds in delay within the scope of Article 19 of the Montreal Convention. See *In re Nig. Charter Flights Contract Litig*., 520 F. Supp. 2d 447, 453 (E.D. NY 2007). Article 19 of the Convention states that "[t]he carrier is liable for damage occasioned by delay in the carriage by air of passengers, baggage or cargo. Nevertheless, the carrier shall not be liable for damage occasioned by delay if it proves that it and its servants and agents took all measures that could reasonably be required to avoid the damage or that it was impossible for it or them to take

such measures." Montreal Convention, Art. 19. While economic damages constitute a legally cognizable harm for delay, damages for emotional distress such as mental anguish, humiliation, etc., are barred from recovery under Article 19. *Campbell v. Air Jam., Ltd.,* 760 F.3d 1165, 1170 (11th Cir 2014); *Daniel v. Virgin Atlantic Airways, Ltd.*, 59 F. Supp. 2d 986, 992 (N.D. Cal. 1998); *Lee v. Am. Airlines, Inc.*, 2002 U.S. Dist. LEXIS 12029, at *11 (N.D. Tex. 2002); *Barrett v. United Airlines, Inc.*, 1994 U.S. Dist. LEXIS 10904, at *3 (N.D. Ill. 1994).

In *Daniel*, the plaintiffs filed a complaint against the defendant airline for damages resulting from a 25-hour delay on an international trip from London to San Francisco. *Id*. at 987. The airline arranged for the plaintiffs to fly the next day to their destination. *Id*. The plaintiffs brought suit stemming from their alleged "anxiety, exhaustion, frustration, humiliation, inconvenience, mental anguish and physical discomfort," resulting from their delay. *Id*. at 992. The court, however, denied recovery, reasoning that no plaintiffs alleged any economic injuries arising from the delay. *Id*. Further, the court held that mere delay alone is not a cognizable harm, and that when a passenger simply arrives late at their destination, there is no required compensation. *Id*. at 993.

Plaintiffs in the present case bring state law claims that are all based in supposed injuries resulting from their removal from a flight and the subsequent delay of their arrival at their destination. As in *Daniel*, Plaintiffs' claims stem from a delay in their transportation or carriage to their destination. Further, like in *Daniel*, Plaintiffs here cannot recover because they seek damages for purely emotional distress injuries associated with the delay in their transportation[1]. (See Complaint at pp. 6-9) (alleging emotional distress, humiliation, lack of respect, and

---

[1] Plaintiffs' vague allegations that they expended funds for tickets and incurred unforeseen fees lack in particularity. In this vein, Plaintiffs do not allege that they were required to pay to re-book their flight.  As such, there are no legitimate allegations establishing an economic loss.

embarrassment). Accordingly, Plaintiffs' claims are barred under Article 19 of the Montreal Convention. See *Vumbaca v. Terminal One Group Ass'n L.P.,* 859 F. Supp. 2d 343, 2012 U.S. Dist. LEXIS 55542, 2012 WL 1377074, \*16 (E.D.N.Y. 2012) (stating that the types of damages recoverable under Article 19 are economic losses occasioned by delay such as taxi fare or replacement of personal items).

    2.    <u>Article 17</u>

As shown above**,** the claims brought by Plaintiffs fall within the jurisdiction of the Montreal Convention as they concern alleged damages related to an international flight between Guatemala, a member state, and terminating in the United States, a member state. As the claims do not result from an accident, and do not concern a physical injury, they are insufficient to form a cause of action under Article 17 and must be dismissed.

Under Article 17 of the Montreal Convention, a carrier is liable for damage sustained in case of injury of a passenger if "the accident" causing the injury took place on board the aircraft or in the course of embarking/disembarking. Montreal Convention, Art. 17(1). Plaintiffs must establish that: (1) there has been an "accident;" (2) the accident caused the plaintiff's injury; and (3) the accident took place on board the aircraft or in the course of the operations of embarking or disembarking. See *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535-36 (1991). Courts have clarified that an "accident" under Article 17 is "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 405 (1985). To be considered an accident under Montreal, the plaintiff must also prove that the unusual or unexpected event proximately caused the alleged injury. *Id*.

In *Campbell v. Air Jam., Ltd.,* the plaintiff was recalled after boarding and forced to reschedule to another departure the next day. *Campbell,* 760 F.3d 1165. The plaintiff was then

forced to pay a $150 fee to change flights and was refused reimbursement of lodging costs, resulting in the plaintiff spending the night outside where he suffered a medical emergency. *Id.* at 1167. The plaintiff made claims under Article 17 of the Montreal Convention, asserting that his removal from the flight constituted an accident. *Id.* The court disagreed, stating explicitly that "bumping," -whereby an airline intentionally causes a passenger to reschedule to a later flight before departure-is systematic, widely known, and therefore not an accident. *Id.* at 1172. The Supreme Court has recognized that "routine travel procedures" do not amount to Article 17 accidents. *Air France*, 470 U.S. at  394 (holding that liability under Article 17 arises only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger, and not where the injury results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, in which case it has not been caused by an accident under Article 17).

Here, Plaintiffs allege emotional distress injuries related to their removal from the subject flight and rebooking on a later flight. Under 11th Circuit jurisprudence, these events cannot be considered an "accident" or external to Plaintiffs in the context of Article 17.  Indeed, Plaintiffs admit in their Complaint that they instigated a conflict with the flight attendants by refusing to fasten their seat belts and then representing to the flight attendants that they were incapable of fastening their seat belts. Through their own actions, and refusal to follow crew instructions, Plaintiffs prompted an altercation. (See Complaint at p. 3). Despite their misconduct, Plaintiffs were ultimately transported by Frontier on a later flight, without having to pay an additional fee. *Id.* at 6. As the court held in *Campbell*, the removal and rebooking of a passenger cannot be considered an "accident" for purposes of an Article 17 claim. *Campbell*, at 1172. Ultimately,

Plaintiffs reached their destination, and any harms they allege were the result of a rescheduling, which the court in *Campbell* held is routine and ordinary, not to be considered an accident. *Id.*

Additionally, Plaintiffs' claims fail under the injury requirement as well. Article 17 only allows for the recovery of damages for emotional distress injuries where such injuries were caused by physical injury. *Murphy v. Airway Air Charter Inc.*, 2024 U.S. Dist. LEXIS 178352, at *13 (S.D. Fla. Sept. 30, 2024). In *Murphy*, the plaintiff sought emotional distress damages that directly resulted from a plane crash in which he was involved. *Id.* However, while the plaintiff's emotional and mental injuries arose generally from the trauma of being involved in a plane crash, he did have physical injuries. *Id.* As a result, this Court held that those emotional damages could be recoverable, but only to the extent that they were the "direct result of the physical injuries he suffered." *Id.* In contrast, Plaintiffs here have not alleged any physical injuries related to their removal and rebooking. Indeed, they readily admit that they willingly departed the subject flight and ultimately took the replacement flight without having any concerns. (See Complaint at p. 6). Therefore, Plaintiffs' allegations only include emotional distress claims, and, therefore, are insufficient to establish an Article 17 claim.

        *3.*    *Punitive damages are not permitted under the Montreal Convention*

In their Complaint, Plaintiffs seek the recovery of punitive damages. *Id.* at 10. Such damages, however, are expressly barred by the Montreal Convention:

> "In the carriage of passengers, baggage, and cargo, any action for damages, however, founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such limits of liability as are set out in this Convention . . . *In any such action, punitive, exemplary, or any other non-compensatory damages shall not be recoverable*."

Montreal Convention, Chapter 3, Article 29 (emphasis added). Accordingly, Plaintiffs' claims for punitive damages should be dismissed with prejudice.

**B.     Alternatively, Plaintiffs' Claims under Fla. Stat. § 501.201 are expressly preempted by the Airline Deregulation Act.**

Assuming, *arguendo*, that the Montreal Convention does not bar Plaintiffs' claims, Count 1 still fails because it is expressly preempted by the Airline Deregulation Act of 1978 ("ADA"). Under the ADA, states may <u>not</u> enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier. 49 USCS § 41101. Common law claims fall within the language of § 41713(b)(1) as they have the force and effect of law. *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 281-282 (2014). When determining whether laws are preempted by the ADA, courts apply a two-factor test: (1) the claim must be related to prices, routes or services of an air carrier; and (2) the claim must constitute an enactment or enforcement of state law. *Tucker v. Hamilton Sundstrand Corp.*, 268 F. Supp. 2d 1360, 1363 (S.D. Fla. June 20, 2003).

In *Morales v. Trans World Airlines, Inc.,* the Supreme Court held that the phrase "related to," in preemption provisions should be given broad meaning. *Morales v. Trans world Airlines, Inc.*, 504 US 374, 383-84 (1990). At issue in *Morales* was the promulgation of travel guidelines by an association of Attorneys General ("NAAG"), which sought to standardize the regulation of airline advertising, frequent flyer programs, and compensation to passengers who voluntarily yield their seats. *Id*. at 379. In particular, the NAAG sought to impose regulations aimed at deceptive practices in marketing and pricing. *Id*. at 390. The Court held that to be "related to" under the ADA preemption provisions, the laws do not have to actually prescribe rates, routes or services, or even be addressed to the airline industry. *Id*. at 385.

The Court further expanded the interpretation in *Am. Airlines v. Wolens*, which concerned an Illinois Consumer Fraud Act of general applicability. See *Am. Airlines v. Wolens*, 513 U.S. 219 (1995). In *Wolens*, passengers brought suit against American Airlines under the Consumer Fraud

Act for alleged deceptive practices involving frequent flyer credits. *Id*. at 224-25. While the Consumer Fraud Act was not specifically enacted to govern the airline industry or fares of carriers, the action brought under fraud protections contained therein had a consequential effect that regulated pricing and marketing of air transportation, and, thus, was preempted by the ADA. *Id*. at 228.

Plaintiffs' claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is a nearly identical situation as in *Wolens*. FDUTPA is a state statute that makes unfair methods of competition and trade practices unlawful. Fla. Stat. §501.201 *et seq*. Plaintiffs here claim that their removal from the subject flight and being rebooked onto another flight was a violation of the FDUTPA. Permitting Plaintiffs to use the FDUTPA as a basis of recovery would effectively allow the state of Florida to regulate the services provided by air carriers. This encroachment would violate the express preemption provision in the ADA. Accordingly, Plaintiffs' claim under the FDUTPA must be dismissed with prejudice.

## C. Alternatively, Frontier's Contract of Carriage reserves the right to deny transportation to passengers.

Assuming, *arguendo*, that the Montreal Convention does not bar Plaintiffs' claims, Count 2 still fails because Frontier's Contract of Carriage specifically permits the actions that provide the bases for Plaintiffs' breach of contract claim[2]. In an action for breach of contract, Florida common law requires a plaintiff to prove (1) the existence of a valid and enforceable contract between the parties, (2) the defendant's material breach of the contract, and (3) that the plaintiff sustained damages as a result of the defendant's breach. *Seven Seas Int'l, LLC v. Frigopesca, C.A.*, 616 F.Supp.3d 1323, 1329 (S.D. Fla. July 21, 2022). Plaintiffs here fail not only to satisfy the elements

---

[2] Plaintiffs' breach of contract claim is also untimely, and therefore barred, under the 6-month time limitation provision in the Contract of Carriage. (See Contract at Section 21).

of an action for breach, but their claim is explicitly barred under the terms of their contract with Frontier.

The contract at issue is Frontier's Contract of Carriage ("Contract"), a copy of which is attached as Exhibit B. *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018) (noting if a document is referred to in the complaint, central to the plaintiff's claim and of undisputed authenticity, the Court may consider the documents in a motion to dismiss). The Contract applies "to all tickets issued for travel on flights operated by or for Frontier . . . whether such ticket was sold by Frontier or its authorized agents or whether such ticket is used." (See Contract at Section 1).

Plaintiffs allege that Frontier represented a specific flight time and date, and then after their purchase, Frontier changed the time of their flight with "no other options." (See Complaint at p. 7). Further, they assert that Frontier was under a contractual obligation to provide Plaintiffs with other options at no additional cost, and such change in flight times caused Plaintiffs to suffer losses to include funds spent on tickets, fees, embarrassment, and inconvenience. However, the terms of the contract at issue expressly state: "Frontier will use reasonable efforts to transport passengers and baggage to the purchased destination, but published schedules, flight times, aircraft types, seat assignments, and similar details set forth in the ticket or Frontier's published schedules are not guaranteed and form no part of this Contract of Carriage." (See Contract at Section 17, p. 20). Further, as to Plaintiffs' demand of "other options at no additional cost," the Contract provides that in the event of cancellation or delay, "Frontier will provide transportation on its own flights at no additional charge to the passenger's original destination . . .," (See Contract at Section 17, p. 19), which Frontier fulfilled by providing Plaintiffs with the next available flight to MIA. (See Complaint at p. 6).

Section 18 of the Contract governs the terms of "Denied Boarding Compensation." Section 18(D) states that a passenger who is denied boarding "will be transported on Frontier's next available flight on which space is available and at no additional charge." (See Contract at Section 18, p. 20). Here, Plaintiffs were transported on the next available flight at no charge, which was in compliance with the Contract. (See Complaint at p. 6).

Moreover, Frontier provided more than what was required to Plaintiffs under the Contract. Under Section 3 of the Contract, Frontier reserved the right to remove passengers from a flight without refund and without liability for a variety of reasons, to include refusal to fasten their seatbelts and interference with flight crew duties. (See Contract at Section 3, p. 5). In their Complaint, Plaintiffs admit to failing to comply with the crew's directives to fasten their seatbelts, and they became disruptive when the crew inquired about their non-compliance. (See Complaint at pp. 2-4).  As such, Frontier could have removed them from the flight without issuing a refund or rebooking them on another flight.

**D.      Plaintiffs fail to sufficiently allege any misrepresentation by Frontier.**

A  plaintiff's pleading is subject to heightened pleading requirements of Rule 9(b), which requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake," alleging the "who, what, when, where, and how of the fraud alleged." *Ganz v. Grifols Therapeutics LLC,* 688 F.Supp. 3d 1209, 1228 (S.D. Fla. Aug. 22, 2023). Under Florida law, a fraud claim requires a showing of: (1) false statement concerning a material fact; (2) made with knowledge of its falsity; (3) with an intention that it induces the plaintiff to act on it; (4) which the plaintiff acts in reliance upon; and (5) injury results. *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010).

1.      *False Statement Concerning a Material Fact*

False representations in a fraud claim must be of past or existing facts. *First Union Brokerage v. Milos*, 717 F. Supp. 1519, 1525 (S.D. Fla. May 12, 1989). A fact is material if, but for the misrepresentation, the plaintiff would not have entered the transaction. *Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1283 (S.D. Fla. Jan. 25, 2021). Plaintiffs state in their complaint that Frontier perpetrated a fraud when two flight attendants allegedly "lie[d] to a pilot," leading to their removal. (Complaint at p. 8). However, at the time of this alleged misrepresentation, Plaintiffs had already purchased their tickets and boarded the subject flight. *Id*. Any misrepresentation between a flight attendant and the Captain had no bearing on Plaintiffs' actions.  Further, Plaintiffs provide no details of what was actually said by the flight attendant, only that she "lie[d]" to have them removed. *Id*. at 8. As such, the Complaint fails to sufficiently plead a false statement nor its materiality, and, therefore, fails to satisfy the first element of a fraud claim.

2.      *Made with Knowledge of its Falsity*

Under Florida law, a plaintiff must allege that the defendant had knowledge that the representation was false. *MDVIP, Inc. v. Beber*, 222 So.3d 555, 562 (Fla. Dist. Ct. App. 2017). Here, Plaintiffs generally assert that two flight attendants made misrepresentations to the Captain. Plaintiffs fail, however, to provide details concerning the alleged misrepresentations. In fact, Plaintiffs provide no description of what was said to the Captain that was allegedly false. (See Complaint at p. at 5). As such, Plaintiffs' claim also fails to satisfy the second element.

3.      *Intention for the Plaintiff to Rely on the Misrepresentation*

To satisfy this element, a plaintiff must show that the defendant intended that the plaintiff would learn of the misrepresentation (*Stevens v. Danek Med., Inc.,* 1999 US Dist. LEXIS 22397, at *16 (S.D. Fla. Apr. 16, 1999)), and that the defendant intended to induce the plaintiff to alter

their position based on the misrepresentation (*Soler v. Secondary Holdings*, 771 So.2d 62, 69-70 (Fla. Dist. Ct. App. 2000)). Here, Plaintiffs' Complaint alleges that the flight attendant intended to induce the Captain, not Plaintiffs. As such, there was neither a misrepresentation to Plaintiffs nor an intent for them to alter their position in reliance on a misrepresentation.

       4.    *Actual and Reasonable Reliance by the Plaintiff*

A plaintiff must establish reliance on the defendant's alleged misrepresentation. This element is satisfied when the misrepresentation (1) justifiably relied upon and (2) is a substantial factor in their decision to act. *Stev-Mar, Inc. v. Matvejs*, 678 So.2d 834, 838 (Fla. Dist. Ct. App. 1996). Plaintiffs here do not allege that they relied on any alleged misrepresentation.

       5.    *Resulting Damages*

A plaintiff must establish actual damages in a claim for fraud, which requires a showing of pecuniary damage or injury by which they have been placed in a worse position than they would have been absent the fraud. *Geico Gen. Ins. Co. v. Hoy*, 136 So.3d 647, 651 (Fla. Dist. Ct. App. 2013). The damages must directly result from the defendant's fraud and be causally connected to such fraud. *Simon v. Celebration Co.*, 883 So.2d 826, 833 (Fla. Dist. Ct. App. 2004). Here, Plaintiffs cannot point to any recoverable damages that resulted from a fraud perpetrated against them, and, therefore, they cannot satisfy any causal connection between a supposed fraud and any harm they might have experienced.

**E.    Plaintiffs failed to exhaust administrative remedies under the Florida Civil Rights Act.**

The Florida Civil Rights Act ("FCRA") prohibits discrimination in multiple areas, to include education, employment, housing, and public accommodations. Fla. Stat. §§ 760.01-760.85, *et seq*.

An individual who believes they have been discriminated against must first file a complaint with the Florida Commission on Human Relations (FCHR) within 365 days of the alleged discriminatory act. *Weaver v. Florida Power & Light*, 1996 US Dist. LEXIS 13403, at *24-25 (S.D. Fla. July 16, 1996). The FCHR then has 180 days to investigate the complaint and determine whether there is reasonable cause to believe that a discriminatory practice has occurred. *Maggio v. Dep't of Labor & Empl. Sec.*, 910 So.2d 876 (Fla. Dist. Ct. App. 2d Dist., Aug. 10, 2005); *see also* Fla. Stat. § 760.11. If the FCHR finds reasonable cause, the aggrieved person may either bring a civil action in court or request an administrative hearing. *Id*.

Here, Plaintiffs allege that Frontier discriminated against them in violation of the FCRA. They have not, however, alleged that they have exhausted their administrative remedies under the FCRA by timely filing a claim with the FCHR. As such, these claims should be dismissed with prejudice.

## V.     **CONCLUSION**

For the foregoing reasons, Frontier Airlines, Inc., respectfully requests that this Court enter an Order dismissing the Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), and for such further relief as this Court deem just and reasonable.

Respectfully submitted this 8th day of October, 2024.

Respectfully submitted,

/s/ *David Echavarria*

David H. Echavarria
Wadsworth Margrey & Dixon, L.L.P.
The Jane Building
261 N.E. 1st Street, 5th Floor
Miami, Florida 33132
Tel: (305)777-1000
de@wmd-law.org

Brian T. Maye
(seeking *pro hac vice* admission)
FITZPATRICK, HUNT & PAGANO LLP
10 S La Salle St, Suite 3400
Chicago, Illinois 60603
Phone: (312) 728-4905
brian.maye@fitzhunt.com

*Counsel for Frontier Airlines, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY certify that a true copy of the foregoing document has been electronically filed and sent to Plaintiff through Clerk of the U.S. District Court for the Southern District of Florida by using the CM/ECF system on this 8th day of October, 2024: Adam Thor and Travis Foster, 1300 Washington Ave #0264, Miami Beach, Florida 32801, Telephone: (201) 638-1077, Facsimile: (201) 575-4079, Email: jbstuna@yahoo.com.

/s/ *David Echavarria*
David H. Echavarria
Wadsworth Margrey & Dixon, L.L.P.
The Jane Building
261 N.E. 1st Street, 5th Floor
Miami, Florida 33132
Tel: (305)777-1000
de@wmd-law.org

**Adam Thor & Travis Foster**

<span style="color:red">EXHIBIT "A"</span>

    *Plaintiffs,*

**v.**                                             **CASE NO.:**

**FRONTIER AIRLINES, INC.,** a Colorado
Corporation,

    *Defendants.*

                                      /

---

## CIVIL COMPLAINT

COMES NOW, Plaintiffs Adam Thor & Travis Foster ("THOR & FOSTER"), together by and through their self undersigned, against Defendant FRONTIER AIRLINES, INC. ("Defendant" or "FRONTIER"); and in support thereof alleges the following:

## NATURE OF CASE

FRONTIER claims they are a passenger friendly budget airline. Plaintiff brings this action, to address misrepresentations and illegal and forceful actions that have been taken by its employees; in return have been committed by Defendant FRONTIER in connection with Defendant's business operations and practices. FRONTIER falsely misled the Plaintiffs into believing that they are purchasing a passenger friendly airline ticket in which the same rules would apply to all passengers, when, in fact, FRONTIER employees change rules as they see fit on a flight which is just one example of their actions being fraudulent and unwarranted.

## JURISDICITON AND VENUE

1.           Subject matter jurisdiction is proper in this Court, under 28 U.S.C. § 1332(A)(l). The defendant is a corporation, which is domiciled in the State of Colorado. The representative Plaintiff is a citizen of the State of Florida, county of Miami Dade.

2.           Personal jurisdiction and venue in this judicial district are proper in that the Defendant has continuous and systemic operations at Miami International Airport ("MIA"), which is in Miami, Florida, where the Defendant operates in a manner that violates the law

consistent with Plaintiff's allegations herein. The conduct herein alleged, which resulted in harm to the plaintiffs, occurred in this judicial district.

## FACTUAL ALLEGATIONS AND FACTS RELATIVE TO PLAINTIFF'S

1.  The named Plaintiff's THOR & FOSTER in this action are citizen's of the United States who reside in Florida, county of Miami Dade.

1.  A) The Defendant FRONTIER does regular and continuous business in the State of Florida, within this judicial district.

2.  FRONTIER sold airline tickets to THOR and FOSTER on November 2, 2023.

3.  FRONTIER's flight path was originally from Guatemala City (GUA) to Miami, Florida (MIA) departing at 1:57pm on January 11, 2024 and arriving at 5:34pm on January 11, 2024 (See exhibit 1).

4.  FRONTIER's confirmation code was KYLB6P (See exhibit 1).

5.  FRONTIER changed the flight departure time and arrival time in November, 2023. The updated flight time was 2:23am on January 11, 2024 arriving at 6:02am on January 11, 2024 (See exhibit 2).

6.  On January 11, 2024, at approximately 3:30am EST THOR and FOSTER were on the for mentioned FRONTIER Airlines flight 18 from Guatemala City to Miami International Airport. THOR and FOSTER were seated in row 24 seat C and row 25 seat B having respectful conversations with several nearby passengers about the trip we had. FOSTER was sitting next to a lady but her husband was across from her one row up. The husband requested if he can sit next to his wife and FOSTER obliged moving his seat to row 24 seat D. As conversations continued while the airline was working to ready the flight for takeoff FOSTER would occasionally speak with the flight attendant working the rear of the plane (ATTENDANT 2). Neither THOR or FOSTER were able to get her name or employee ID number at the time of any conversation. ATTENDANT 2 is described as Caucasian around 5 feet tall with blond hair age around mid 30's.

ATTENDANT 2 would speak to FOSTER briefly as she passed by and they would engage in a playful game of rock paper scissors. THOR had very little communication with ATTENDANT 2 as THOR was sitting listing to music after finishing conversations with some passengers. As the plane was taxiing to the runway ATTENDANT 2 came up to THOR and said "are you trying to pull a fast one by me" but it was said in a joking manner. THOR then stated "I don't know what you are talking about". ATTENDANT 2 said "oh your seatbelt is not on" and continued to joke with THOR about it. THOR wasn't paying attention and didn't realize the seatbelt was off. To joke back with ATTENDANT 2 THOR then stated he didn't know how to put on the seatbelt and needed help. The conversation ended; ATTENDANT 2 looked at the religious necklace THOR was wearing then smirked at THOR and walked away as THOR proceeded to place the seatbelt on.

7.    Several minutes later, an unidentified flight attendant (LEAD ATTENDANT) that had been working the front of the plane that never came to the back nor had contact with THOR or FOSTER suddenly approached with an unwarranted question. LEAD ATTENDANT (who refused to give her name but is described as Caucasian around 5 feet 6 inches tall with blond hair age around mid 50's), asked if FOSTER was going to be a problem during the flight. FOSTER immediately asked if she was being serious. LEAD ATTENDANT responded that she will have us removed from the plane if we didn't agree to not being a problem. THOR stated we won't be a problem and everything is fine. FOSTER then stated that he didn't know who she was and that she's been working the front the entire time and no one had ever spoken to her. THOR also stated we have no idea what is going on and asked what this is about. LEAD ATTENDANT suddenly confessed stating that she received a call that we were bothering other passengers and were refusing to put on our seatbelts. FOSTER told the flight

attendant that we were not bothering other people and to ask those around about the positive conversations THOR and FOSTER had been having.  LEAD ATTENDANT  then told FOSTER that he had been a problem since he entered the plane.   THOR intervened and said out loud that's discrimination after watching LEAD ATTENDANT's tone towards FOSTER who is African American.  ATTENDANT 2 was standing there during this conversation and told LEAD ATTENDANT that it wasn't FOSTER who was doing anything wrong.  ATTENDANT 2 stated it was THOR that didn't put on the seatbelt.  LEAD ATTENDANT saw the seatbelt was on THOR and continued her conversation directed at FOSTER, looking to argue and attempt to escalate the conversation.  LEAD ATTENDANT stated she did not know who we were and FOSTER then asked the flight attendant why she was discriminating against him and if this continues then she will if she find out who THOR and FOSTER are when we file a complaint to the airline.  LEAD ATTENDANT immediately stated loudly that FOSTER threatened her and she said she was calling the captain.  FRONTIER's employees decided to make an issue out of nothing to show their power and discrimination towards THOR and FOSTER who are of a different religion and race then the flight attendants.

8.     After several minutes the flight began to taxi back to the jet bridge with no announcements being made to the passengers. The airline lights were placed back on and minutes later several FRONTIER employees and security boarded the flight.

9.     What seemed like a great deal of confusion to the airline employees who entered the plane; they eventually made their way to come over and speak to THOR and FOSTER and said to exit the flight. THOR asked to speak to the pilot to explain the lies that were told by LEAD ATTENDANT to him but was denied this.

10. During the withdrawal from the FRONTIER flight, THOR and FOSTER were both assaulted by the Frontier employees. If the lead flight attendant felt threatened why did she decided to stand immediately in the doorway as both plaintiff's were walking out? (Video evidence will be provide)

11. During the withdrawal from the FRONTIER flight, THOR and FOSTER were unlawfully detained for 2 hours by FRONTIER employees.

12. During the withdrawal from the FRONTIER flight, THOR and FOSTER were discriminated against by FRONTIER flight attendant employees. THOR and FOSTER were told they were exiting the plane for questioning and they were not being kicked off the flight. They were advised the plane was not going to leave until the issue was resolved.

13. FRONTIER supervisor in Guatemala refused to give the names of LEAD ATTENDANT and ATTENDANT 2.

14. The same FRONTIER supervisor in Guatemala stated the LEAD ATTENDANT did call the captain to have THOR and FOSTER removed.

15. After going back through customs and finding out the facts of the altercation, the FRONTIER supervisor in Guatemala rebooked THOR and FOSTER for the next flight out from Guatemala City (GUA) to Miami, Florida (MIA) departing at 2:21am on January 12, 2024 and arriving at 6:02am on January 12, 2024 (See exhibit 3).

16. FRONTIER supervisor in Guatemala booked THOR and FOSTER in emergency seating for the above mentioned flight. THOR asked why would FRONTIER place the seats in the emergency row if we were a threat or a problem to the airline. FRONTIER supervisor in Guatemala stated we were not a threat or a problem and we never should have been removed from the flight. The original flight had already departed at this time but all employees on the ground were trying to grasp why LEAD ATTENDANT and ATTENDANT 2 had acted the way they did and their treatment towards passengers THOR and FOSTER. If

THOR and FOSTER truly threatened the LEAD ATTENDANT, why would FRONTIER allow them to board another flight and possibly do that to another crew? Why was THOR and FOSTER not immediately refunded and banned from FRONTIER? The LEAD ATTENDANT abused her power and authority towards THOR and FOSTER by having them kicked off the plane as a show of temperament and control.

17. THOR and FOSTER boarded the next flight with no delay or concerns and arrived in Miami International Airport at the scheduled time. THOR spoke to airport police who advised to file a criminal complaint/police report which was done online a few weeks later. Report tracking number is T24000247. The report was not fully processed because the incident occurred outside of Miami.

18. THOR also spoke to FRONTIER employees at Miami International Airport who refused to give the names of the flight crew and advised to call the help line. The help line also refused the information (See exhibit 4). This information is still requested.

## COUNT I

## DECEPTIVE OR MISLEADING PRACTICES IN VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201 *ET SEQ.* ("FDUTPA")

1. Plaintiffs re-allege and incorporate by reference the allegations set forth in each preceding paragraph of this Complaint as though fully set forth herein, and further states:

2. FDUTPA operates to protect consumers from unscrupulous business practices such as unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practice, in the conduct or trade of a business.

3.    FRONTIER engaged in conduct of unconscionable acts or practices in a manner which was materially deceptive and misleading to passengers, and this conduct caused harm and damages to Plaintiffs.

4.    FRONTIER materially misled the Plaintiffs in the manner discussed above, including by failing to conspicuously disclose information.

5.    As a result of FRONTIER's misrepresentations and omissions, the Plaintiffs suffered losses, including funds expended for tickets, unforeseen fees, embarrassment, and inconveniences.

6.    The Plaintiffs received emotional distress, unfair treatment, denial of due process, lack of respect & humiliation.  The Plaintiffs seek punitive damages for the above mention acts committed by FRONTIER for its gross misconduct against the public and the Plaintiffs.


## COUNT II

### BREACH OF CONTRACT, UNDER FLORIDA'S COMMON LAW

1.    Plaintiffs re-allege and incorporate by reference the allegations set forth in each preceding paragraph of this Complaint as though fully set forth herein, and further states:

2.    FRONTIER represented a specific flight time and date and then after the purchase of the ticket this time changed forcing the Plaintiff's to be stuck with that new time frame with no other options.

3.    FRONTIER was also under a contractual obligation to provide the Plaintiffs with other options at no additional cost.

4.    FRONTIER failed in its obligation to provide the Plaintiffs with this aforesaid information.

5.    At the time of booking, the Plaintiffs were unaware that they would have to change the trip to meet the change of the flight times.

6.      FRONTIER breached its agreement with the Plaintiffs when it changed the Plaintiffs flight times after they had received payment.

7.      As a result of FRONTIER's misrepresentation and omissions, the Plaintiffs suffered losses, including funds expended on tickets, fees, embarrassment, and inconvenience, due to FRONTIER's fraudulent activity.

## COUNT III

**FRAUDULENT MISREPRESENTATION, UNDER FLORIDA COMMON LAW**

1.      Plaintiffs re-allege and incorporate by reference the allegations set forth in each preceding paragraph of this Complaint as though fully set forth herein, and further states:

2.      While inducing the Plaintiffs to purchase tickets and throughout the contractual relationship between the parties, FRONTIER made numerous representations that were materially false, and FRONTIER made numerous material omissions.

3.      FRONTIER's misrepresentations and omissions included but are not limited to:

- Having a Lead flight attendant lie to a pilot to remove passengers whom she did not like due to his race and religion;

- Having a second flight attendant participant in the same misrepresentations;

4.      FRONTIER knew, or acted with reckless disregard for the truth, as to all of the material misrepresentations that are alleged in this Complaint.

5.      FRONTIER knew, or acted with reckless disregard for the trust, as to all of the material omissions alleged in this Complaint.

6.      The Plaintiffs' reliance on FRONTIER's misrepresentations and/or omissions caused them significant, specific harm and damages, as alleged hereinabove.

The Plaintiffs received emotional distress, unfair treatment, denial of due process, lack of respect & humiliation. The Plaintiffs seek punitive damages for the above mention acts committed by FRONTIER for its gross misconduct against the public and the Plaintiffs.

## COUNT IV

## DISCRIMINATION OF CUSTOMERS, IN VIOLATION OF FLORIDA STATUTES

1. Plaintiffs re-allege and incorporate by reference the allegations set forth in each preceding paragraph of this Complaint as though fully set forth herein, and further states:

2. Florida laws provide a statutory cause of action for Discrimination against customers that gives the prevailing party a basis of relief to recover fees and punitive damages.

3. THOR was discriminated against due to his religion.

4. FOSTER was discriminated against due to his race.

## PRAYER FOR RELIEF (AS TO ALL COUNTS)

**WHEREFORE,** Plaintiffs ADAM THOR and TRAVIS FOSTER, individually and through their self undersigned, hereby respectfully request this Honorable Court find in favor of the Plaintiffs, and against Defendant FRONTIER AIRLINES, INC.; and award the following relief against Defendant:

1. Declaratory judgment, under Fla. Stat. Defendant's acts or practices violated the rights of the Plaintiffs due to discrimination, unlawful detention, physical assault, embarrassment;

2. Order that the Defendant discontinue these same acts or practices;

3. Order that the Defendant must reimburse the Plaintiffs for actual damages, under Fla. Stat.§§ 501.211(2) and 817.41.

4. Order that the Defendant reimburse Plaintiffs for any and all airport costs costs that the Plaintiffs incurred related to the purchase of the tickets, and any and all fees paid, including but not limited to baggage, seat, and cancellation fees;

5. Order that the Defendant reimburse the Plaintiffs for all of the fees and costs paid to the Defendant, all travel and lodging expenses incurred as a result of the Defendant's fraudulent conduct

6. Order that the Defendant pay all statutory fines, under the laws of Florida, for the willful conduct, in an amount of TEN THOUSAND DOLLARS ($10,000.00) for each violation under Fla. Stat.;

7. Order that the Defendant pay for the Plaintiffs' emotional suffering and harm for the above mentioned counts;

8. Order that the Defendant pay the Plaintiffs for all monetary and other losses, as permitted by Fla. Stat.§ 501.213;

9. Require the Defendant to pay statutory fines, costs of suit, and attorneys' fees, including those identified under Fla. Stat. § 501.2105;

10. Punitive damages in an amount of not less than TEN MILLION DOLLARS ($10,000,000.00), for the blatant, unwarranted, malicious, and intentional nature of the Defendant's gross misconduct, to deter the Defendant and other airlines from further similar conduct, as provided for under Fla. Stat. and,

11. Grant the Plaintiffs any and all other and further relief as this Honorable Court may find just and proper.

**WHEREFORE,** the Plaintiffs, Adam Thor & Travis Foster, individually through their

self undersigned, hereby demand a trial by jury as to all issues so triable.

DATED: 7/24/2024                                 Respectfully submitted,

*Adam Thor Travis Foster*

**Adam Thor & Travis Foster**
1300 Washington Ave #0264
Miami Beach, Florida 32801
Telephone: (201) 638-1077
Facsimile: (201) 575-4079
jbstuna@yahoo.com

EXHIBIT "B"

# FRONTIER AIRLINES Contract of Carriage

**Effective Date:    04/10/23**



**CONTRACT OF CARRIAGE** <span style="float:right">Rev83 04/10/23</span>

## Table of Contents

| Section | Subject | Page |
|---|---|---|
| 1. | Introduction | 2 |
| 2. | Definitions | 2 |
| 3. | Refusal to Transport and Special Conditions | 3 |
| 4. | International Transportation | 6 |
| 5. | Child Passengers | 7 |
| 6. | Service Animals | 9 |
| 7. | Smoking | 9 |
| 8. | Tickets | 9 |
| 9. | Ticket Validity and Itinerary Changes | 10 |
| 10. | Check-in Times | 11 |
| 11. | Fares | 11 |
| 12. | Checked Baggage | 12 |
| 13. | Carry-On Baggage | 13 |
| 14. | Conditions and Charges for Special Items | 14 |
| 15. | Limitations of Liability | 16 |
| 16. | Claim Limits and Procedures | 17 |
| 17. | Failure to Operate on Schedule or Failure to Carry | 19 |
| 18. | Denied Boarding Compensation | 20 |
| 19. | Refunds; No-Show Cancellations and Service Charges | 21 |
| 20. | Currency and Mode of Payment and Fees | 23 |
| 21. | Miscellaneous | 23 |
| 22. | Contingency Plan for Extended Tarmac Delays | 24 |



**CONTRACT OF CARRIAGE**                                    Rev83 04/10/23

---

## 1.  Introduction

The following terms and conditions as well as such additional terms and conditions presented on Frontier Airlines' website, fare rules, published schedules or printed on or in any ticket or ticket-less travel authorization apply to all tickets issued for travel on flights operated by or for Frontier Airlines, Inc. ("Frontier"), as well as that transportation, regardless of whether such ticket was sold by Frontier or its authorized agents or whether such ticket is used ("Contract of Carriage").

This document is available for public inspection at all Frontier locations. Copies may be obtained by visiting the Frontier's web site at www.FlyFrontier.com or by writing to: Frontier Airlines, Inc., Customer Relations, 4545 Airport Way, Denver, CO 80239.

## 2.  Definitions

A. **Codeshare** – A marketing and business arrangement in which two airlines "share" the same flight (which might include connecting legs). One airline places its designator code and flight number on a flight operated by the other airline, and markets and sells tickets for that shared flight as part of its published schedule.

B. **Code** – The U.S. Internal Revenue Code of 1986, as amended.

C. **DOT** – U.S. Department of Transportation.

D. **FAA** – U.S. Federal Aviation Administration.

E. **Fare Rules** – The rules and requirements associated with a ticket.

F. **IATA** – International Air Transport Association.

G. **No-Show Cancellation** – The automatic cancellation of a passenger's ticket upon such passenger failing to either (i) check-in for such passenger's flight, or (ii) board such passenger's flight, in either instance within the required times. The automatic cancellation will apply to all subsequent flights, including return flights, on the itinerary. Presentation of a ticket by someone other than the named passenger renders the ticket void and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage. (See section 19. )

H. **Qualified Individual with a Disability** – An individual with a disability who: (i) has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities; (ii) has a record of such an impairment; or, (iii) is regarded as having such an impairment, as further defined in 14 CFR 382.5.

I. **Standby Passenger** – A passenger boarded subject to availability of seat space at departure time and only after all passengers having confirmed reservations for the flight have been boarded.

J. **Stopover** – An intentional interruption in a passenger's trip in excess of 4 hours at a point between the place of departure and the final destination.

K. **STRETCH Seat** - A seat located in the front rows and exit rows of certain Frontier aircraft that have additional legroom. These seats are made available to passengers for a fee.

L. **Ticket** -The record of agreement, including electronic tickets, for passenger air transportation provided by the airline under certain terms and conditions to the passenger as described on the ticket, in the fare rules, and in this Contract of Carriage.

M. **TSA** – U.S. Transportation Security Administration.

---



**CONTRACT OF CARRIAGE**                                             Rev83 04/10/23

## 3.  Refusal to Transport and Special Conditions

A.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case Frontier will provide a refund of the amount paid for their ticket, which will be the limit of Frontier's liability.

    1)  Government Request -- To comply with a government requisition of space or request for emergency transportation (e.g., in connection with national defense or natural disaster (actual, threatened, or reported)).

    2)  No Seat for Safety Assistant - If a passenger requires a safety assistant (see section 3. B.6) and there is not a seat available on the applicable flight and, thus, both the passenger and the safety assistant are denied transportation. For purposes of determining whether a seat is available for a safety assistant, the safety assistant is deemed to have checked in at the same time as the individual with the disability.

B.  Frontier may refuse to provide transportation to any person and may require that a passenger leave an aircraft or be removed from an aircraft for the following reasons, in which case no refund will be due and Frontier will have no further liability.

    1)  Government Direction - To comply with a direction of a government official acting in their official capacity to remove or not provide transportation to a specific individual.

    2)  Identification -- The passenger refuses to produce a government-issued identification as required by Frontier's representatives or as required by law.

    3)  *MyFrontier* Account; Card on File - The passenger refuses to create a *MyFrontier* account or have a credit or debit card on file with Frontier, each of which is active at the time of travel. Any fees owed to Frontier may be unilaterally charged by Frontier using the card or other method of payment that is on file with Frontier.

    4)  Balance Due - If at the time of travel there is any balance unpaid to Frontier for ticket or optional services charges, the ticket and all optional services may be canceled, whether or not a passenger has been notified of such cancellation.

    5)  Passports/Visas -- The passenger intending to travel across any international border fails to possess and present all valid documents (passports, visas, certificates, etc.) required by the laws of the countries from, over, or into which the passenger will fly, which will in all cases be the passenger's exclusive responsibility.

    6)  Failure to Check In or Appear - The passenger fails to check-in for their flight within the required times or appear for boarding of that flight within the required times. (The ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20)).

    7)  Special Medical Requirements -- The passenger will be refused transport if the passenger requires medical equipment be used in flight or services (i) not provided by Frontier, (ii) that may not be used in flight, or (iii) does not have sufficient supplies therefor. The foregoing includes any medical equipment that would require use of power from the aircraft, medical equipment for which the passenger does not have sufficient batteries for the duration of the flight plus unexpected delays. Passengers must be able to sit in a single seat with the seat in the full and upright position, which precludes passengers that must lie flat or that must be transported on a stretcher. Frontier does not provide medical oxygen.



**CONTRACT OF CARRIAGE**                                                          Rev83 04/10/23

*EXCEPTION:*   A respiratory device (e.g., ventilator, respirator, CPAP machine or Portable Oxygen Concentrator) is considered an assistive device and is permitted as carry-on or checked baggage at no charge provided that all batteries must be transported in carry-on baggage and must be packaged in a manner that protects them from physical damage and short circuits, and provided that if the device is to be used in flight: (i) the passenger must carry enough fully-charged batteries to power the device throughout the entire journey including all ground time (between connections), the duration of the flight and for unexpected delays, (ii) the device must be approved by the FAA with stickers indicating such, and (iii) prior to traveling, the passenger must complete the Portable Oxygen Concentrator Medical Authorization (form 30881) available on Frontier's website or obtain a medical statement from the passenger's physician addressing the points on the POC Medical Authorization form.

*NOTE:*        *Passengers are referred to 14 CFR Part 121, SFAR No. 106 for regulations regarding and a list of Portable Oxygen Concentrators that are approved for use on aircraft.*

8) Qualified Individual with a Disability -- If transportation is refused because the passenger fails to comply with the following: Qualified individuals with a disability will be transported in accordance with the conditions and requirements of 14 C.F.R. § 382 unless the carriage of such individuals may impair the safety of the flight or violate Federal Aviation Regulations. Pursuant to 14 C.F.R. § 382.113, Frontier does not provide certain extensive in flight special services such as assistance in actual eating, assistance within the lavatory or at the individual's seat with elimination functions, or provision of medical services. Moreover, pursuant to 14 C.F.R. § 382.29, a qualified individual with a disability may be required to be accompanied by a safety assistant as a condition of being provided air transportation in any of the following circumstances: (i) when the individual, because of a mental disability, is unable to comprehend or respond appropriately to safety instructions from employees, including the required safety briefing, (ii) when the individual has a mobility impairment so severe that the individual is unable to assist in the passenger's own evacuation of the aircraft, (iii) when the individual has both severe hearing and severe vision impairments, if the individual cannot establish some means of communication with employees adequate to permit transmission of the required safety briefing, (iv) on the day of departure, if it is determined that an individual meeting the criteria of (i), (ii) or (iii) must travel with a safety assistant, contrary to the individual's self-assessment that the passenger is capable of traveling independently, the safety assistant will not be charged to accompany the individual with a disability.

9) Prisoners - Frontier will not transport any prisoners under any circumstances.

10) Proper Attire - Any passenger who is barefoot and over 3 years of age, unless required to be barefoot for medical reasons, or who is not otherwise fully clothed in clothing that is not lewd or obscene, threatening, intimidating, or would be objectionable to reasonable persons.

11) Malodorous Condition - Any passenger who has a severe or offensive body odor that is not due to a disability.

12) Intoxication - Any passenger who appears to be intoxicated or under the influence of drugs.



**CONTRACT OF CARRIAGE**                                                Rev83 04/10/23

13) Communicable Disease or Infection - A passenger who has a communicable disease or infection (that is known or reasonably believed to pose a direct threat to the health or safety of others in the course of flight) may be denied boarding by Frontier. If such a passenger presents a medical certificate dated within 10 days of the date of the flight for which it is being presented that includes specific conditions under which the individual can travel and not pose a direct threat to the health and safety of other persons, transportation will be provided to such individual unless it is not reasonable or feasible to implement the conditions set forth in the medical certificate as necessary to prevent the transmission of the disease or infection to other persons in the normal course of flight. Unacceptable measures include, but are not limited to: a required separation between the passenger and other persons, use of medical equipment not permitted to be used on the aircraft, or a requirement that any other passenger wear protective gear.

    a) 2019 Novel Coronavirus (COVID-19) – Frontier may screen passengers during the check-in and boarding process, and may deny boarding to passengers who Frontier reasonably believes do not meet Frontier's COVID-19 screening measures. Screening will include, but is not limited to: completion of a health acknowledgment, required wearing of facial coverings, and submission to a temperature check. Notwithstanding Section 11 above, a passenger who presents a medical certificate dated within 10 days of the date of the flight for which it is being presented may be denied boarding if, on the planned date of travel, the passenger fails to meet Frontier's COVID-19 screening measures.

14) Refusal or Inability to Sit - Any passenger who is unwilling or unable to sit in an upright position during takeoff and landing with the seat belt fastened.

15) Failure to Follow Instructions - Any passenger who refuses to obey instructions from an employee or crewmember.

16) Use of Ticket Issued to Other Person - Any passenger who attempts to use a ticket not issued to that person. Transfer of a ticket by a passenger to another person is not permitted. (This ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20)).

17) Interference - Any passenger who interferes with any member of the flight crew in pursuit of their duties or attempts to do so.

18) Smoking - Any passenger who smokes or attempts to smoke on an aircraft.

19) Weapon - Any passenger who, except as permitted by law (see 49 C.F.R. § 1544.219), wears or has on or about their persons concealed or unconcealed, deadly or dangerous weapons.

20) Purchase in Violation of Contract of Carriage - Any passenger that purchases a ticket in violation of this Contract of Carriage or any fare rule. In addition, Frontier may (i) invalidate the tickets or any other that may have been purchased in the same manner, (ii) cancel any remaining portion of the passenger's itinerary, or (iii) confiscate any unused portions of the ticket.

21) General Refusal - Any person whom Frontier has informed is not permitted to purchase transportation from Frontier.

C. Refusal to Sell Transportation - Frontier may refuse to sell transportation to any person, including the following, and may inform such persons that they are not permitted to purchase transportation from Frontier:

    1) Refusal to Comply - A person who refuses to comply with instruction given by employees or representatives prohibiting the solicitation of items for sale or purchase, including airline tickets, passes, or travel award certificates.

    2) Prior Conduct - A person who has disrupted airline operations, mistreated employees, or has not complied with Frontier's policies or otherwise violates this Contract of Carriage.



**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

   3)  Misconduct - A person who has committed a fraudulent act against Frontier.

D. Customer of Size - If, in Frontier's sole judgment, a passenger is unable to sit in an aircraft seat without lifting either or both armrests and occupying all or a portion of the adjacent seats, or encroaching into the aisle or adjacent seats, the passenger will be required to purchase a ticket for an additional seat (or more, if required to accommodate the passenger) at the price then applicable. If sufficient, contiguous seats are not available, the passenger will be given the option to switch to flights on which such seats are available (for which applicable fees will apply) or be given a refund.

E. Allergies (Peanut, Pet, or Chemical) - Items are not removed from the aircraft to accommodate a passenger's allergy to a particular food, substance, or chemical. A variety of snacks are served on board many flights, including products that may contain peanuts or other nuts. A "peanut-free" or "chemical-free" environment cannot be provided to passengers onboard the aircraft. Passengers are advised to consult a healthcare professional regarding the risks of onboard exposure to any allergen.

F. Pregnancy - Passengers who are pregnant are urged to consult with their doctor on whether it is safe to travel by air, including with due consideration to the possibility of turbulence, cabin pressurization, significantly increased risk of deep vein thrombosis associated with pregnancy, and lack of ready access to medical care. This is particularly important for women in their ninth month of pregnancy, who are urged to obtain an examination from their physician shortly before flying to confirm air travel will be safe. Women with a history of complications or premature delivery should not fly if pregnant. By traveling with Frontier, pregnant women acknowledge and accept these risks. Different policies for passengers who are pregnant may apply on any leg of a codeshare flight that is operated by the codeshare airline.

G. Electronic Surveillance of Passengers and Baggage - Passengers and their baggage are subject to inspection, including via electronic means, with or without the passenger's consent or knowledge.

H. Diversion While in Flight or Return to Gate- In the event that Frontier is required to divert an aircraft while in flight or return to gate because a passenger requires medical attention or due to the passenger's conduct, the passenger may be required to reimburse Frontier for the costs that Frontier incurs, including the cost to accommodate other passengers. The amount due will be as determined by Frontier.

## 4.  International Transportation

A. Compliance with Regulations - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for any aid or information given by any agent or employee to any passenger in connection with obtaining necessary documents or complying therewith (including as may be provided in this Contract of Carriage) or the consequences to any passenger resulting from the passenger's failure to obtain such documents or to comply with such laws, regulations, orders, demands, requirements, or instructions.

B. Compliance with Foreign Country Regulations regarding Importation of Goods - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from the passenger's failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

C. Customs Inspection - If required, a passenger must attend the inspection of the passenger's baggage, checked or unchecked, by customs or other government officials. Frontier accepts no responsibility to the passenger if they fail to observe this condition.



D. Government Regulation - No liability shall attach to Frontier if, based on what it understands to be applicable law, government regulation, demand, order, or requirement, it refuses to carry passenger. If, however, it is ultimately determined that Frontier was incorrect, the limit of its liability will be to refund the amount paid for the ticket on which transportation was refused.

E. International Operations - Frontier is required to make an attempt to obtain emergency contact information from a passenger traveling into or out of a foreign country. If a passenger refuses to provide emergency contact information, Frontier will document the attempt and may require the passenger to sign the document.

F. Indemnification - A passenger shall indemnify Frontier for any loss, damage, or expense suffered or incurred by Frontier by reason of the passenger's failure to possess any required travel documents or other failure to comply with the provisions of this section, including the applicable fare if Frontier is required to transport the passenger home from a country. Frontier is not liable to the passenger for loss or expense due to the passenger's failure to comply with this provision.

G. Baggage Limitation - Passengers shall comply with all laws, regulations, orders, demands, or travel requirements regarding baggage size and weight limitations of countries to be flown from, into, or over. Frontier is not liable for the consequences to any passenger resulting from the passenger's failure to comply with such laws, regulations, orders, demands, requirements, or instructions.

## 5.   Child Passengers

A. Accompanied Children -- Children from 7 days through 14 years of age may travel with another passenger who is at least 15 years old.

B. Unaccompanied Children

1) Frontier does not allow children under the age of 15 years old to travel unaccompanied; they must be accompanied by a passenger who is at least 15 years old. Passengers who are 15 years old or older may travel on Frontier without an adult companion. A birth certificate, official school ID, or other form of ID may be requested for age verification purposes if the child's age appears questionable.

   *NOTE:*        *Passengers under age 18 traveling without both parents may need additional documentation to travel across international borders, depending on the country's requirements.*

C. Infant and Child Fares (except as otherwise provided in a specific fare rule) are as follows:

1) Infants under 2 years of age are accepted, without charge, when the infant does not occupy a separate seat and is accompanied by a fare-paying passenger at least 15 years old. A birth certificate may be requested for age verification purposes if the infant's age appears questionable.

   *NOTE:*        *Due to supplemental equipment considerations, the number of infants accepted per flight may be limited based on aircraft type.*

2) One adult may accompany up to two infants under the age of 2.

   a)   When an adult passenger is traveling with two infants under 2 years of age, a seat must be purchased for at least one infant. The fare is the same as an adult fare.

3) Children 7 days - 14 years of age occupying a seat are charged the same fare as an adult passenger.

   *NOTE:*        *Passengers under age 2 traveling as lap children (not purchasing a seat) are subject to international taxes. These taxes must be paid prior to boarding the originating departure flight.*



D. Child Restraint Systems - Frontier accepts infant and child restraint systems (car seat or harness) approved for air travel that fit in the applicable aircraft seat with the arm rest down that meet the following requirements:

1) Approved seats manufactured to U.S. standards between January 1, 1981, and February 25, 1985, must bear the label: "This child restraint system conforms to all applicable Federal motor vehicle safety standards."

2) Seats manufactured to U.S. standards on or after February 26, 1985, must bear two labels: (i) "This child restraint system conforms to all applicable Federal motor vehicle safety standards" and (ii) "THIS RESTRAINT IS CERTIFIED FOR USE IN MOTOR VEHICLES AND AIRCRAFT" in red lettering.

3) Seats not meeting the above criteria must bear a label or markings showing: (i) the seat was approved by a foreign government, (ii) the seat was manufactured under the standards of the United Nations, (iii) the seat or child restraint device furnished by the certificate holder was approved by the FAA through Type Certificate or Supplemental Type Certificate, or (iv) the seat or child restraint device was approved by the FAA in accordance with 14 C.F.R § 21.8(d), or FAA Technical Standard Order C-100b, or a later version.

   *NOTE 1:*    *A child under the age of 2 must be held in the passenger's lap or be seated in an approved car seat for taxi, takeoff, and landing.*

   *NOTE 2:*    *Frontier encourages all adults traveling with infants under 2 years of age to secure the infant in an approved car seat or harness in the infant's own purchased seat.*

4) Child Harness - The FAA-approved AMSafe Aviation C.A.R.E.S. child harness device may be used on-board the aircraft. It is designed for children weighing between 22 and 44 pounds (between 10 and 20 kilograms) and must bear the label "FAA Approved in accordance with 14 CFR 21.305(d) approved for aircraft use only."

5) Car Seats - A car seat may be used by a child between the ages of 7 days and 2 years if seat space is available after boarding, even if a seat has not been purchased for the child. A car seat may be used by any child when a separate seat has been purchased. To use a car seat onboard the aircraft:

   a) It must bear manufacturer labels identifying approval for aircraft use, as described in subsection (1) and (2) above.

   b) It must have a solid seat and solid back.

   c) It must have restraint straps installed to hold the child in the car seat.

   d) The child may not exceed the weight limitation of the car seat.

   e) It may not be placed in the emergency exit rows, in the seats immediately in front of or behind the exit rows, or in any seat that has an airbag seatbelt installed.

   f) Window seats are the preferred location for a car seat, so it does not impede a passenger's movement or egress into the aisle. Other seat assignments are permitted provided the car seat is not obstructing the egress of any passenger.

   g) It must be secured by a seat belt at all times.

6) Booster Seats - Booster seats may be carried onboard aircraft but must be stowed in an overhead compartment or underneath the seat for takeoff and landing. Once the aircraft has reached cruising altitude, the passenger may use the seat during the flight. The booster seat must be stowed when the aircraft begins its descent.



**CONTRACT OF CARRIAGE**                                           Rev83 04/10/23

## 6.  Service Animals

A. General - The following categories of service animals are allowed in the cabin without charge:

   1)  Trained service dogs that assist passengers with disabilities. Passengers traveling with a service dog must complete and submit the Department of Transportation Service Animal Air Transportation Form, attesting to the dog's health, behavior, and training. For reservations booked more than 48 hours prior to travel, passengers must submit the completed form no later than 48 hours prior to travel. For reservations booked less than 48 hours prior to travel, passengers must submit the completed form in person to a Customer Service Agent upon arrival at the airport. Only dogs will be accepted as trained service animals. The animal must be at least 4 months old. The passenger is required to keep the animal under control at all times, with the animal on a leash or harness while in the boarding area and onboard the aircraft. Psychiatric support animals are recognized as trained service animals. Comfort animals, companionship animals, or any other non-task-trained animals are not recognized as service animals. Service animals in training will not be accepted.

   2)  Service Animals trained in explosive detection, contraband search, or search and rescue on active duty and traveling for that purpose will be accepted for travel. The passenger must present credible documentation the animal is traveling for that purpose.

B. Seating - The passenger may sit anywhere, except in an emergency exit row, provided the animal does not obstruct an aisle or egress of passengers in an emergency evacuation. The animal must fit under the seat or on the passenger's lap. If the passenger is seated in row 1, the animal will not be allowed on the passenger's lap. The animal may not occupy a seat. An animal that cannot or does not comply with the foregoing will not be accepted.

C. International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel with a service animal or emotional support animal. Different policies may apply on any leg of a codeshare flight that is operated by the codeshare airline.

D. Oxygen - No oxygen will be administered to a service animal in the event of an emergency.

## 7.  Smoking

A. Smoking is prohibited on all flights.

B. Federal law prohibits tampering with, disabling, or destroying any smoke detector installed in an aircraft lavatory.

C. The use of electronic smoking devices is prohibited at all times on all aircraft.

## 8.  Tickets

A. A passenger is entitled to transportation only upon presentation of a valid electronic ticket (e-ticket). The ticket entitles the passenger to transportation between the point of origin and the destination.

*NOTE:*    *Paper tickets are not issued on Frontier ticket stock. Only electronic tickets are issued for travel on Frontier. However, paper tickets from other airlines may be accepted for travel at Frontier's discretion.*



**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

B. Tickets are honored only in the order in which they are issued.

C. The following practices are prohibited:

1) Back to Back Ticketing -- The purchase or use of portions of tickets from two or more tickets issued as round-trip fares or other scheme for circumventing minimum stay requirements.

2) Throwaway Ticketing -- The purchase or use of round-trip tickets for one-way travel.

3) Hidden City/Point Beyond Ticketing -- The purchase or use of a ticket from a point before the passenger's actual origin or to a point beyond the passenger's actual destination.

D. A ticket which has not been properly issued or paid for, or which has been altered, mutilated, or improperly issued by an unauthorized party is not valid for travel or refund.

E. The purchaser of a ticket and the passenger intending to use it are responsible for ensuring that the ticket accurately states the name of the **passenger**.

F. A ticket may only be used by the person named on the ticket. Frontier is not liable to the purchaser of a ticket if the ticket is used by someone other than the person named on the ticket. Tickets may not be purchased for the transport of items of baggage that are too large to be stowed safely in a suitable baggage compartment in the aircraft cabin or under a passenger seat (such as, but not limited to, musical instruments, electronic equipment).

G. Presentation of a ticket by someone other than the named passenger renders the ticket void. The ticket is subject to confiscation, and the ticket will then be treated as a No-Show Cancellation for all purposes of this Contract of Carriage. (See section 19. )

H. An additional processing fee may apply to each ticket purchased or changed via Frontier's reservation center.

## 9.  Ticket Validity and Itinerary Changes

A. Period of Validity

1) Tickets issued by Frontier are valid for transportation only on the flights and dates shown on the ticket and have no value and are not valid for transportation thereafter. If a passenger cancels a ticket before the scheduled flight departure time, the value of the ticket less a service fee and certain other carrier charges will be retained for 90 days from the date of cancellation of the ticket in the form of a credit. The credit has no cash or refund value and may only be applied to subsequent tickets on Frontier flights for the same passenger as the original ticket. In the case of a No-Show Cancellation, see section 19.

2) Except as required by law or as provided in this Contract of Carriage, Frontier shall have no obligation of any kind to reschedule any passengers who cancels a ticket before the scheduled flight departure time or to provide them with any refund or other credit for unused tickets.

3) Except as required by law or as provided in this Contract of Carriage, in the case of a No-Show Cancellation, Frontier shall have no obligation of any kind to reschedule any such passengers on any other flight, and the rules respecting No-Show Cancellations shall apply (see section 19. ).

B. Except for tickets purchased for travel within 7 days (168 hours) of purchase, all tickets may be canceled within twenty-four (24) hours of the purchase and a full refund will be given. After that time, except for tickets and services that are purchased as refundable, all tickets and optional charges or services are non-refundable.



**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

---

## 10. Check-in Times

A. Airport Check-In - It is the passenger's responsibility to arrive at the airport, taking into consideration travel time both to and within the applicable airport, with enough time to complete check-in, to drop off any checked bags with a Frontier representative or Frontier-provided system, and to complete processing through the security check point.

B. Passengers can check in beginning 2 hours before departure at Frontier's airport check-in counters or 24 hours before departure at www.FlyFrontier.com or on the Frontier mobile app, if the reservation is eligible for online or mobile app check-in.

C. Check-In Times

   1) For domestic flights (originating and to a destination within the United States), the passenger must be checked in with a printed boarding pass or a Frontier mobile app boarding pass in-hand at least 45 minutes prior to scheduled departure whether or not checking bags.

      a) Effective August 16, 2023, all passengers must be checked in with a printed boarding pass or a Frontier mobile app digital boarding pass in-hand, and with checked bags, if any, presented to and accepted by a Frontier representative or Frontier-provided system, at least 60 minutes prior to scheduled departure.

   2) For international flights, the passenger must be checked in with a printed boarding pass or a Frontier mobile app digital boarding pass in-hand and with checked bags, if any, presented to and accepted by a Frontier representative or Frontier-provided system, at least 60 minutes prior to scheduled departure.

D. Time Limit for Checking Bags - Baggage to be checked must be presented at the airport within the minimum check-in time. Passengers who present baggage after the minimum check-in time may be refused transport. At some airports, the counter may close at the check-in cut-off time, in such cases, passenger and baggage check-in are not permitted after the check-in deadline. In the event that baggage is accepted after the minimum check-in time, the passenger will be liable for any costs and fees for the bag to be delivered in the event that it is not carried on the same flight.

E. Availability for Boarding - Tickets and seat assignments are subject to cancellation for passengers who fail to make themselves available for boarding at the departure gate at least 20 minutes prior to scheduled departure.

F. Failure to Check In or Appear - If a passenger fails to check in or board the flight within the required time, the ticket will be deemed to be a No-Show Cancellation (see Section 2.G) and canceled. All subsequent flights, including return flights, on the itinerary will also be treated as No-Show Cancellations (see Section 20).

G. Misconnected Passengers - The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operating by Frontier will be accommodated on the next available flight operated by Frontier to the same destination. Frontier will not provide transportation on another airline or reimburse the cost of transportation purchased from another airline. The ticket of any passenger who does not meet the minimum check-in time due to the late arrival of an inbound connecting flight operated by any other airline will be canceled and no refund or accommodation on another flight will be due unless available and purchased at the applicable price by the passenger.

---

## 11. Fares

A. Fares apply for transportation only between the airports for which they are published.

---



B. When a passenger requires connecting service with arrival at one airport and departure from another airport, transportation between those airports must be arranged by and at the expense of the passenger.

C. Fares are subject to change without notice until a ticket is issued.

## 12. Checked Baggage

A. Fees applicable to checked baggage:

   1) Baggage fees apply to each checked bag.

   2) Active U.S. military personnel, with Common Access Card (CAC), may check two bags at no charge for all types of tickets. Overweight and oversize charges for the first two free bags are also waived. This policy is for active U.S. military personnel only and does not extend to family members or traveling companions.

B. Baggage Allowance Exceptions - The following may be checked or carried on at no charge and do not count toward the passenger's baggage allowance.

   1) Medical Assistive Devices - Canes, crutches, braces, wheelchairs, etc. for the use of the passenger. There is no limit to the number of mobility aids a passenger may check. Medical assistive devices must be packed separately, in protective packaging, for baggage fees to be waived.

   2) Wheelchairs - In compliance with federal law, wheelchairs or other types of mobility devices for the passenger are accepted as checked baggage in addition to the passenger's baggage allowance at no additional charge. Certain Frontier aircraft can accommodate up to two wheelchairs up to 40 inches (101 cm) high, 50 inches (127 cm) long, 13 inches (33 cm) wide, and weighing no more than 70 pounds (31 kilograms) in the cabin of the aircraft on a first-come, first-served basis. Wheelchairs carried in the cabin of the aircraft will be brought to the front of the aircraft after all other passengers have deplaned.

   3) Essential Infant or Child Items - Child restraint devices, car seats, strollers, diaper bags, and other essential baby items when the infant is traveling. These items must be packed separately, in protective packaging, for baggage fees to be waived.

C. Acceptable Baggage - Frontier will accept for transportation as baggage such personal property necessary or appropriate for the wear, use, comfort, or convenience of the passenger for the purpose of the trip, subject to the following:

   1) Checked Baggage Size and Weight:

      a) Excess baggage charge will be applied to any checked baggage that exceeds the standard weight or dimension. Standard baggage size is defined as maximum of 62 inches (157 cm) in linear dimension (height plus length plus width).

      Standard baggage weight is defined as:

         – For tickets purchased before January 18, 2022, maximum of 50 pounds (22.6 kilograms).
         – For tickets purchased on or after January 18, 2022, and travel completed before March 1, 2022, maximum of 50 pounds (22.6 kilograms).
         – For tickets purchased on or after January 18, 2022, and travel on or after March 1, 2022, maximum of 40 pounds (18.1 kilograms).

      b) Baggage weighing 100 or more pounds (45 kilograms) or exceeding 110 linear inches will not be accepted, with the exception of assistive devices or musical instruments.

   2) The TSA website maintains a list of items that passengers are not permitted to check in baggage. See www.tsa.gov for a complete list. Baggage containing any items on that list will not be accepted.



**CONTRACT OF CARRIAGE**                                                      Rev83 04/10/23

3) An item for transportation not suitably packaged to withstand ordinary handling and turbulence, or of a size, weight, or character that renders it unsuitable for transportation will not be accepted.

4) The passenger is responsible for ensuring that all items packed in checked baggage are properly packaged and padded to resist handling and turbulence. (Refer to section 16. )

5) All baggage is subject to inspection by Frontier. Frontier is not, however, obligated to perform an inspection. Frontier will refuse to transport or will remove baggage if the passenger refuses to submit the baggage for inspection.

6) Frontier will not accept baggage or other personal property for storage.

7) Frontier will check baggage only when the passenger presents a valid ticket for transportation on the applicable flight.

8) The passenger's name, address, and telephone number must appear on the baggage.

9) Frontier has the right to refuse to transport baggage on any flight other than the one carrying the passenger.

10) Baggage will not be checked:

    a) To a point that is not reflected on the passenger's ticket.

    b) Other than the passenger's destination on the applicable flight, but if the flight is a connecting flight, to the final destination, but if that connecting flight is scheduled to depart from an airport different from the one at which the passenger is scheduled to arrive then only to the destination of the first leg.

11) Live animals are not accepted as checked baggage.

12) Agricultural items, perishable items, or products that do not conform with customs or agricultural government law at the flight's destination will not be accepted.

13) Frontier will not accept for carriage any restricted/hazardous materials as defined in the DOT Hazardous Materials Regulations (49 C.F.R. §§ 171-177) and IATA Dangerous Goods Regulations. Examples of such goods are (i) liquor products over 140 proof, (ii) gasoline-powered tools, (iii) compressed gases, (iv) corrosives (such as acids and wet batteries), (v) explosives (such as dynamite and fireworks), (vi) flammables (such as matches and lighter fuels), (vii) poisons, and (viii) magnetic and radioactive materials. Electronic smoking devices (commonly referred to as e-cigarettes or personal vaporizers) pose a safety risk and are not permitted in checked baggage. These items are permitted in carry-on baggage. Spare lithium batteries are not allowed in checked baggage.

14) Perishable items must be packaged properly such that they cannot leak through their packaging. (Refer to section 16. )

D. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 13. Carry-On Baggage

A. Passengers are permitted up to two carry-on items:

    1) One free personal item not larger than 8" x 14" x 18" (20 cm x 35 cm x 45 cm) that must fit within the personal item portion of the bag sizer.



**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

2) One carry-on item not larger than 10"H x 16"W x 24"L (25 cm x 40 cm x 114 cm) and weighing not more than 35 pounds (15 kilograms) that may be placed in the overhead compartment or under the seat. A fee for the carry-on item may apply based on the ticket type purchased. Active U.S. military personnel, with Common Access Card (CAC), may take a carry-on item free of charge for all types of tickets.

3) The size and weight of an item may be measured using manual or automated methods. If a bag sizer is used, items must fit completely into the applicable portion, including any wheels and handles, and without the passenger using undue force, as determined at Frontier's sole direction. If an item exceeds allowed dimensions, the item may be gate checked or considered to be a carry-on item, in each case to which the applicable fee will apply. Any fees owed may be unilaterally charged by Frontier using the card or other method of payment that is on file with Frontier.

B. The TSA website maintains a list of items that passengers are not permitted to carry onboard an aircraft. See www.tsa.gov for a complete list. Carry-on items containing any items on that list will not be accepted.

C. The passenger is responsible for all items brought on board the aircraft. Items must be stored under a seat or in the overhead compartment.

D. Use of Portable Electronic Devices (PEDs)

1) Small authorized PEDs are devices under 2 pounds and are of a size that can easily be placed in a seat pocket along with the other materials that are normally found in the seat pocket (Passenger Safety Information Card, Menu or airsickness bag). They include devices like tablets, readers, and mobile phones and may be used during all phases of flight when in airplane mode including taxi, takeoff, and landing. However, if using them during taxi, takeoff, and landing, you must secure these devices by holding them, putting them in your pocket or holster, or placing them in a seatback pocket.

2) Large authorized PEDs are devices 2 pounds or more such as full-size laptops. They must be turned off and stowed during taxi, takeoff, and landing. You may stow them under the seat in front of you or in an overhead compartment. These devices may be used above 10,000 feet when authorized by a Flight Attendant announcement.

3) On all flights operating outside U.S. airspace, PEDs cannot be used during taxi, takeoff, and landing, but may be used in airplane mode above 10,000 feet when authorized by a Flight Attendant announcement.

E. Sound Emitting Devices - Portable electronic devices that emit sound (e.g., music or video players or games) may be used only with headphones and provided the sound, even via the headphones, cannot be heard by others.

F. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 14. Conditions and Charges for Special Items

The following items are accepted as checked or carry-on baggage, subject to the conditions specified and payment of applicable fees.

*NOTE:* *Refer to the Sports Equipment and Special/Fragile Items chart hosted at* www.FlyFrontier.com *for other items which have specific packaging or other requirements which need to be met in order to be transported by air. All items listed on the Sports Equipment and Special/Fragile Items chart are subject to baggage fees. Baggage fees for excess, oversize, and overweight are cumulative and all may be assessed on one item.*

A. Firearms -- Firearms are accepted as checked baggage on flights within the United States, but not international flights. Carriage of any firearm is subject to the following conditions:



1) In accordance with federal law, a passenger who presents baggage that contains a firearm must (i) ensure the firearm is unloaded, (ii) pack the firearm in a lockable, hard-sided container, (iii) declare the firearm unloaded at the time of check-in, and (iv) sign a "Firearms Unloaded" declaration.

2) If the firearm is in a locked, hard-sided container INSIDE a piece of checked baggage, the declaration must be placed inside the checked baggage and proximate to, but not inside of, that container.

3) If the firearm is in a locked, hard-sided container, but NOT INSIDE a piece of checked baggage, the declaration must be placed inside the container.

4) After screening, the passenger must lock the firearm container and retain the key or combination.

5) The passenger must make arrangements for and assume full responsibility for complying with any applicable laws, customs and government regulations, or restrictions of the state or territory to which the firearm is being transported.

B. Ammunition - Ammunition for firearms (whether or not the firearm is also being carried) is accepted as checked baggage on flights within the United States, but not international flights, subject to the following conditions:

1) The ammunition must be securely packed in the original manufacturer's packaging, fiber (such as cardboard), wood, or metal boxes or other sturdy and durable packaging providing sufficient cartridge separation.

2) Each passenger is allowed up to 11 pounds (4.9 kilograms) of ammunition.

3) Loaded ammunition clips and magazines must also be securely boxed.

4) Ammunition may be packed with the firearm.

C. Live Animals -- Frontier accepts live animals only in the cabin of the aircraft, not as checked baggage. The transportation of live animals is subject to fees for carriage and the terms and conditions below.

EXCEPTION:  See separate rules with respect to service animals referred to in *6. Service Animals*.

1) Only the following animals are permitted:

   a) Domestic Flights -- Domesticated dogs, cats, rabbits, guinea pigs, hamsters, or small household birds.

   b) International Flights -- Domesticated dogs and cats.

2) The passengers carrying the animal are responsible for making arrangements and assuming full responsibility for complying with any applicable laws, customs and other governmental regulations, requirements or restrictions of the country, state or territory to which the animal is being transported.

3) The passengers carrying the animal are responsible for paying any import/export fees, duties, or taxes that may apply as well as any fines for failing to comply with applicable law.

4) International - Restrictions for travel with an animal to international destinations vary by country. Frontier recommends contacting the appropriate embassy or consulate before purchasing a ticket for travel.

5) The passengers carrying the animal are responsible for making advance reservations because no more than ten pet containers will be accepted per flight.

6) No passenger may carry more than one pet container.

7) The animal must remain in a pet container at all times and may not be fed while onboard the aircraft.

8) The pet container must be large enough for the pet to stand, turn around, and lie down in a natural position and fit underneath the seat in front of the passenger.



**CONTRACT OF CARRIAGE**                                    Rev83 04/10/23

9) The animal may not disrupt other passengers and the passenger must be able to quiet the animal without removing it from the container.

10) The container counts toward the carry-on baggage allowance.

11) No oxygen will be administered to an animal in the event of an emergency.

D. Human Remains:

1) Crematory remains (human or animal) may be transported as carry-on or checked baggage subject to the following conditions:

   a) The container must be made of a material such as wood or plastic that can be successfully screened by the TSA. If the container cannot be screened, it will not be allowed.

   b) If the container is checked, it must be sufficiently packaged in a well-insulated and sturdy container.

   c) If the container is carried onboard the flight, it counts toward the passenger's carry-on allowance and it must meet carry-on baggage dimensions.

2) Human remains in caskets are not accepted.

E. Dry Ice (frozen carbon dioxide) -- Dry ice may be carried under the following conditions:

1) A maximum of 5.5 pounds (2.5 kilograms) of dry ice per passenger is accepted in checked or carry-on baggage.

2) The cooler or package must permit the release of carbon dioxide gas. Styrofoam containers are not accepted.

F. Bicycle - Bicycles may be carried under the following conditions:

1) The handlebars must be fixed sideways, and the pedals removed or wrapped in plastic foam or similar material and the entire bicycle is encased in a hard-sided case.

2) Bicycles may only be carried as checked baggage.

3) A fee applies for each bicycle checked as baggage.

4) Bicycles are excluded from baggage liability unless packaged in a hard-sided case.

G. Special Items - The following items may exceed carry-on baggage dimensions but may be taken as a carry-on item (and count toward the carry-on bag allowance) as long as they fit in the overhead bin: fishing rods, tennis rackets, wedding attire, poster tubes, and musical instruments. If any such items are comprised of more than one piece, they must be packaged together to be considered one item. The carry-on bag fee applies.

H. Codeshare Flights – The baggage policy of the airline on which a passenger originally booked the codeshare flight will apply to the entire itinerary.

## 15. Limitations of Liability

A. Consequential Damages – Unless it is specifically stated otherwise in this Contract of Carriage, or as required by any applicable law, Frontier is not liable for any indirect, special, or consequential damages arising out of or resulting from transportation provided, delay in transportation, or any failure to provide transportation.



**CONTRACT OF CARRIAGE**                                      Rev83 04/10/23

B. International Transportation – With respect to international transportation, as defined in the following referenced conventions, as applicable, Frontier's liability will be limited as specified in, as and if applicable, (i) the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw, October 12, 1929, as amended ("Warsaw Convention"), but subject to the Agreement entered into by Frontier pursuant to 14 C.F.R. Part 203 or (ii) the Convention for the Unification of Certain Rules for International Carriage by Air, signed at Montreal, May 28, 1999 ("Montreal Convention").

## 16. Claim Limits and Procedures

A. Limitations of Liability

1) Domestic Flights – With respect to domestic flights (i.e., those flights originating and ending within the United States) without any scheduled stops outside of the United States, or international flights to which neither the Warsaw Convention or the Montreal Convention apply, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of checked baggage shall be limited to $3,800 for all bags checked under a single ticketed passenger's name. Frontier will not be liable for:

   i)   The following items included in checked baggage, with or without the knowledge of Frontier:

   - alcohol
   - antiques
   - art, paintings
   - art supplies
   - artifacts
   - bags made from lightweight material not designed for shipping
   - blueprints
   - books
   - business documents
   - CDs
   - cell phones
   - Cigars, cigarettes, electronic cigarettes, vape pens
   - collectibles
   - computer equipment (including hardware, software and all accessories)

   - dentures
   - drugs prohibited by federal or state law
   - DVDs
   - eyeglasses
   - files
   - food/perishables
   - fragile articles or other similar valuable items and commercial effects
   - hand and power tools
   - heirlooms
   - irreplaceable items
   - jewelry
   - keys
   - machinery and its parts
   - manuscripts
   - medication
   - money

   - natural fur products
   - negotiable papers/ instruments
   - optics
   - orthodontics
   - orthotics
   - photographic/video/ electronic equipment and accessories
   - precious metals or stones
   - publications
   - samples
   - securities
   - silverware
   - sound reproduction equipment
   - sunglasses
   - surgical supports
   - toys

   ii)  Articles strapped, taped, or tied to other pieces of baggage, which may become separated as a result of normal handling during transportation

   iii) Damage to the following items when not packed in a hard-sided case or other packing that is suitable for the item:

   - Prosthetic devices
   - Medical equipment
   - Musical instruments



**C O N T R A C T   O F   C A R R I A G E**                                   Rev83 04/10/23

- Recreational or sporting equipment
- Baby items including car seats and strollers

iv) Damage to handles, straps, wheels, and zippers arising from normal wear and tear caused by ordinary handling of baggage

v) Damage arising from ordinary wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt

vi) Damage resulting from over-packing or misuse

vii) Damage arising from liquids on or in baggage; including weather (e.g., rain, snow)

2) International Flights/Montreal Convention – With respect to international flights to which the Montreal Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay in the carriage of baggage (whether checked or carry-on) shall be limited to 1,288 Special Drawing Rights per ticketed passenger. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount.

3) International Flights/Warsaw Convention – With respect to international flights to which the Warsaw Convention applies, Frontier's limit of liability, if any, for the loss, damage or delay of (i) checked baggage shall be limited to 17 Special Drawing Rights per pound, or actual value, whichever is less, (ii) carry-on baggage shall be limited to 332 Special Drawing Rights or actual value, whichever is less. The conversion rate, available at www.imf.org, in effect on the date of loss will be used for determining maximum liability amount. Absent evidence to the contrary, bags will be presumed to weigh 20 pounds.

4) Frontier does not accept declarations of higher value or accept fees based on such declarations.

5) Subject to the above specified limits of liability, Frontier will compensate a passenger whose baggage has been lost, damaged or delayed for reasonable, documented direct damages up to the specified limit of liability, provided the passenger has made reasonable effort to minimize the amount of damage and provided documentation of the loss. The compensation due for lost or damaged property will be determined by the lesser of the documented original purchase price less applicable depreciation or the cost to make repairs.

6) Frontier's liability for wheelchairs, mobility aids, and assistive devices used by a passenger with a disability if lost or damaged by Frontier shall be up to the original purchase price of the device without regard to the above limitations of liability.

7) Passengers who incur incidental expenses as a result of delayed baggage delivery will be reimbursed per established DOT guidelines, subject to the above limitations of liability (as applicable). Any amounts paid to the passenger for incidental expenses will be deducted from the total loss amount prior to check issuance.

8) Frontier will not be liable for loss or damage to carry-on baggage unless such damage is caused by Frontier's or its agent's negligence, which does not include damage resulting from turbulence, shifting of items during flight, or ordinary handling, including placing the baggage in overhead compartments or under seats.

9) Frontier's employees and agents are not liable to passengers.

B. Time Limit to Make Claims and Procedures



**CONTRACT OF CARRIAGE**                                    Rev83 04/10/23

1) With respect to domestic flights and those international flights to which the Montreal Convention does not apply, any claim based on damage, delay, or loss of baggage must be reported to Frontier within 4 hours of the arrival of the flight on which the loss or damage is claimed to have occurred. Claims for pilferage may be made up to 24 hours after flight arrival. Any documentation required to support the claim must be submitted within 30 days from the date the requesting passenger receives the claim form packet from Frontier; Frontier will not be liable if the completed claims are not submitted, with documentation, within that time period.

2) With respect to international flights to which the Montreal Convention applies, in the case of baggage damage, the person entitled to delivery must submit in writing to Frontier as soon as possible after discovery of the damage, and at the latest in writing 7 days from receipt of checked baggage and in the case of delay or loss, complaints must be made at the latest within 21 days from the date on which the baggage has been placed at the passenger's disposal or should have been placed at the passenger's disposal in the case of loss. All claims must be made in writing and must be accompanied by supporting documentation. Any subsequent request for documentation from Frontier must be provided to Frontier within 21 days of the request.

## 17. Failure to Operate on Schedule or Failure to Carry

A. Liability Limited - Frontier will use reasonable efforts to transport passengers and baggage to the purchased destination, but published schedules, flight times, aircraft types, seat assignments, and similar details set forth in the ticket or Frontier's published schedules are not guaranteed and form no part of this Contract of Carriage. Frontier may substitute alternate aircraft, change schedules, delay or cancel flights, change seat assignments, and alter or omit stopping places shown on the ticket as required by its operations in Frontier's sole discretion. Frontier's obligations for failure to operate any flight, failure to operate a flight according to its schedule, or for changing the schedule or type of equipment used on any flight, with or without notice to the passenger, are set forth below.

B. Force Majeure - In the occurrence of a force majeure event, Frontier may cancel, divert, or delay any flight without liability except to provide a refund for the unused portion of the ticket.

C. Delay, Misconnection, or Cancellation - In the event (i) a passenger's flight is canceled, (ii) a passenger is denied boarding because an aircraft with lesser capacity is substituted, (iii) a passenger misses a connecting Frontier flight due to a delay or cancellation of a Frontier flight (but not flights of other carriers), (iv) a passenger is delivered to a different destination because of the omission of a scheduled stop to which the passenger held a ticket, to the extent possible, Frontier will provide transportation on its own flights at no additional charge to the passenger's original destination or equivalent destination as provided herein. Frontier will have no obligation to provide transportation on another carrier. If Frontier cannot provide the foregoing transportation, Frontier shall, if requested, provide a refund for the unused portion of the passenger's ticket in lieu of the transportation under the foregoing. The foregoing shall be the limit of Frontier's liability for the matters covered by this provision.

D. For purposes of involuntary reroute (a diversion), use this link https://www.flyfrontier.com/travel/travel-info/travel-policies#same-day-flight-changes and see under the title Same Day Flight Changes section of the flyfrontier.com page for the groups of cities that are considered to be the same point. If Frontier is able to provide transportation to one of the specified alternative cities, Frontier has met its obligation for transport to the final destination.

E. Schedule Change Prior to Day of Travel -- When a passenger's itinerary is changed because of a modification in Frontier's schedule, arrangements will be made to:



**CONTRACT OF CARRIAGE**                                                    Rev83 04/10/23

    1) Transport the passenger over its own route system to the destination; or

    2) In the event Frontier determines that the schedule modification is significant, Frontier shall, if requested, provide passengers a refund of the cost of the unused portion of the ticket.

F. Extended Onboard Ground Delays -- In accordance with FAA regulations, Frontier maintains and complies with a separate Contingency Plan for Lengthy Tarmac Delays. Frontier's Contingency Plan for Lengthy Tarmac Delays may be found on Frontier's website at https://az832049.vo.msecnd.net/media/1567/f9-contingency-plan-for-extended-tarmac-delays-2015.pdf. Frontier's Contingency Plan for Lengthy Tarmac Delays is subject to change without notice and is not part of this Contract of Carriage.

## 18. Denied Boarding Compensation

When a seat cannot be provided due to an inadequate number of seats for the number of passengers holding confirmed reservations (overbooking), the actions described in this section will be taken.

A. Voluntary -- Passengers on a flight with an overbooking will be encouraged to voluntarily relinquish their seats in exchange for alternate travel and for compensation in the form of an Electronic Travel Voucher for future transportation to be booked within 365 days on Frontier. The request and selection of volunteers will be in a manner determined solely by Frontier.

B. Involuntary -- If insufficient passengers volunteer, passengers who cannot be accommodated on the flight will be denied boarding and Frontier will provide transportation on a Frontier flight to the same destination. After a passenger's boarding pass is collected or scanned and accepted by the gate agent, and the passenger has boarded, a passenger may be removed from a flight only for safety or security reasons or in accordance with Section 3 of this Contract of Carriage.

C. Amount of Compensation -- Frontier will compensate a passenger for involuntary-denied boarding based on the new arrival time after the originally scheduled arrival time as follows:

| Domestic | International | Compensation |
|---|---|---|
| New arrival time within :59 | New arrival time within :59 | No Compensation |
| New arrival time within 1 - 1:59 | New arrival time within 1 - 3:59 | 200% (2x) of the one-way fare, not to exceed $775 |
| New arrival time 2 hours or more | New arrival time 4 hours or more | 400% (4x) of the one-way fare, not to exceed $1550 |

*NOTE 1:*    *Frontier is not obligated to provide compensation for denied boarding when an aircraft of lesser capacity is substituted due to operational or safety reasons.*

*NOTE 2:*    *No compensation will be due if boarding is denied for reasons other than overbooking (e.g., pursuant to applicable law or other provisions of this Contract of Carriage).*

D. Onward Transportation for Passengers Denied Boarding

    1) A passenger denied boarding, voluntarily or involuntarily, pursuant to this section, will be transported on Frontier's next available flight on which space is available and at no additional charge.

    2) If a passenger who has been denied boarding, voluntarily or involuntarily, pursuant to this section, wishes to modify the travel date, if space is available, a ticket will be provided for travel within 72 hours at no additional charge.



**CONTRACT OF CARRIAGE**                                          Rev83 04/10/23

E. Electronic Travel Voucher

1) Involuntary Denied Boarding - Frontier may offer passengers denied boarding involuntarily an Electronic Travel Voucher good for transportation on Frontier in lieu of cash compensation otherwise due under this section. Passengers may decline such offer in favor of the applicable cash compensation. The Electronic Travel Voucher has no refund value, will expire 365 days from date of issuance, is not transferable, cannot be applied to group travel (more than nine passengers on a booking), and may be used towards a booking with multiple people as long as the passenger to whom it is issued is present in the same booking. Electronic Travel Vouchers can be applied to ancillary services (e.g., seats, baggage), fees, and taxes. If a ticket purchased with an Electronic Travel Voucher costs less than the amount of the voucher, no residual value remains. Changes to a ticket purchased with an Electronic Travel Voucher may result in a change fee and any additional fare difference based on the rules of the issued ticket.

2) Voluntary Denied Boarding - Frontier may offer passengers who volunteer for denied boarding an Electronic Travel Voucher good for transportation on Frontier. The Electronic Travel Voucher has no refund value, will expire 365 days from date of issuance, is not transferable, cannot be applied to group travel (more than nine passengers on a booking), and may be used towards a booking with multiple people as long as the passenger to whom it is issued is present in the booking. Electronic Travel Vouchers can be applied to ancillary services (e.g., seats, baggage) and fees; no taxes will be covered by the Electronic Travel Voucher. If a ticket purchased with an Electronic Travel Voucher costs less than the amount of the voucher, no residual value remains. Changes to a ticket purchased with an Electronic Travel Voucher may result in a change fee and any additional fare difference based on the rules of the issued ticket.

F. Time of Offer and Payment of Compensation

1) The offer of compensation for overbooking will be made by Frontier on the day and at the place where the failure to provide confirmed space occurred. If accepted, compensation will be given to the passenger. If the alternative transportation arranged for the passenger's convenience departs before the payment can be made, payment will be made by mail or other means within 24 hours after the denied boarding occurs.

2) Acceptance of any Denied Boarding Compensation constitutes full compensation for damages incurred by the passenger as a result of Frontier's failure to provide the passenger with a confirmed seat.

## 19. Refunds; No-Show Cancellations and Service Charges

A. The provisions of this Section (20.A) shall apply with respect to refunds for tickets under this Contract of Carriage:

1) All refunds will be subject to government laws, rules, regulations, or orders of the country in which the ticket was originally purchased and of the country in which the refund is being made.

2) The first portion of any amount refunded will be the full amount of government-imposed taxes and fees, as well as certain carrier charges applied to the ticket purchase.

3) If applicable, cancellation fees or service charges will be assessed in a separate transaction and netted against the refunded amount.

4) No Use - If no portion of the ticket has been used, the refund amount will be equal to the fare, plus any ancillary purchases (checked or carry-on bag, seat assignments, etc.), all government-imposed charges, taxes, and fees, and certain carrier charges paid for the ticket issued to the passenger.

5) Partial use - If a portion of the ticket has been used:



**C O N T R A C T   O F   C A R R I A G E**                                      Rev83 04/10/23

a) One-way ticket: If travel was terminated at an intermediate or stopover point, the refund amount will be equal to the amount of the fare and all ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid from the point of termination to the destination or to the point at which transportation is to resume and will be the lowest one-way fare for the class of service paid for minus any discount, plus all government-imposed charges, taxes, and fees and certain carrier charges, as proportionately attributable, which shall be reasonably determined by Frontier.

b) Round-trip ticket purchased: the refund amount will be equal to the amount of the fare and ancillary purchases (checked or carry-on bag, seat assignments, etc.) paid on the unused portion of the ticket, plus all government-imposed charges, taxes, and fees and certain carrier charges, as proportionately attributable, which shall be reasonably determined by Frontier.

B. In addition to the provisions of Section 20.A, in situations other than No-Show Cancellations, the provisions of this Section (20.B) shall apply with respect to refunds for tickets under this Contract of Carriage:

1) For refundable tickets that are canceled prior to flight departure, passengers should fill out an online request, available at www.FlyFrontier.com.

2) For tickets that are canceled up to 24 hours after the time of purchase (excluding tickets purchased within seven days before travel, which will be held as a credit, less the applicable cancellation fee and certain carrier charges), passengers should cancel their tickets online at www.FlyFrontier.com.

3) <u>Payment</u> - A refund will be provided only to the original purchaser's form of payment. However, if, at the time of the application for refund, evidence is submitted that a company purchased the ticket on behalf of its employee or a travel agency has made a refund to its client, the refund will be made directly to the employee's company or the travel agency. The Table below illustrates other rules respecting payment:

| Payment Type | Refunded To |
|---|---|
| Universal Air Travel Plan | The subscriber against whose account the ticket was charged |
| Transportation Request issued by a government agency other than a U.S. government agency | The government agency that issued the transportation request |
| U.S. Government Transportation Request | The U.S. government agency that issued the U.S. Government Transportation Request with a check payable to the "Treasurer of the United States" |
| Card | The account of the person to whom the credit or debit card was issued |
| Electronic Travel Voucher | The original voucher value will be reinstated if the cancellation is within 90 days of the voucher issue date |

4) <u>Identity</u> - Frontier does not assume responsibility to confirm that the person using or presenting a ticket for refund is the true owner of the ticket.

C. In situations involving a No-Show Cancellation, in addition to the provisions of Section 20.A, the provisions of this Section (20.C) shall apply with respect to refunds for tickets under this Contract of Carriage:

1) Automatic Refund; No Additional Submission Required – In the case of a No-Show Cancellation, the refund described in Section 20.A shall be automatically refunded to the purchaser.

2) Automatic Imposition of a No-Show Cancellation Service Charge.



**CONTRACT OF CARRIAGE**

    a)  Refund – The refund described in Section 20.A shall be given, but will be netted against the No-Show Cancellation Service Charge in a separate transaction.

    b)  Imposition of a No-Show Cancellation Service Charge – A No-Show Cancellation Service Charge will apply with respect to the ticket (or the segment for which the No-Show Cancellation applies) in the amount of the fare plus all ancillary purchases plus all government-imposed charges, taxes and fees and certain carrier charges attributable to the fare and ancillary purchases.

    c)  The payment of the No-Show Cancellation Service Charge shall not entitle the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) to transportation.

D. To the extent required by applicable law, including Code § 6415(a) and the regulations promulgated thereunder, the purchaser (and, if different, the passenger or other party to whom a refund would otherwise be due) hereby consents to Frontier recovering any allowance of a credit or refund of any overpayment of governmental fees or tax imposed, including pursuant to Code § 4261, including in each case which overpayment arises directly or indirectly as a result of a No-Show Cancellation as contemplated in this Contract of Carriage.

## 20. Currency and Mode of Payment and Fees

A. Fares, fees, charges, and taxes charged or collected by Frontier are due in United States dollars, except for bookings made through available Canadian online travel sites, which are due in Canadian dollars. Any purchases made in connection with such bookings would also be due in Canadian dollars.

B. All amounts due to Frontier must be paid with a credit or debit card; Frontier may require that each passenger have a card on file with Frontier to purchase a ticket and complete transport on Frontier. Frontier does not accept cash for any transactions, including those on Frontier's aircraft, except that Frontier may accept cash at certain international locations.

C. Frontier does not accept personal checks, traveler's checks, certified (cashier's) checks, or money orders.

D. A service charge will apply to any improper chargeback on a credit or debit card and may be charged to the same card via which the chargeback is made.

## 21. Miscellaneous

A. Subordination to Law - In all cases, this Contract of Carriage will be subordinate to any applicable law.

B. Metric References - Conversion of British units to metric units are approximate and for reference only. The British unit will apply.

C. Change Without Notice - Except as may be required by applicable laws, government regulations, orders, and requirements, Frontier reserves the right to amend this Contract of Carriage without notice, provided that no such change shall apply to carriage that has commenced.

D. No Waiver/Modification of Terms - No employee or agent of Frontier has the authority to waive, modify, or alter any provisions of the Contract of Carriage unless authorized by a corporate officer of Frontier. Accommodations provided beyond what is required by the Contract of Carriage do not alter the Contract of Carriage. Frontier's employees and agents, including third party travel agents and online travel sites, are only authorized to sell tickets for air transportation on Frontier subject to the Contract of Carriage.



**CONTRACT OF CARRIAGE**                                                Rev83 04/10/23

E. Changes in Rules, Fares, and Charges - Unless otherwise provided within specific fare rules, transportation is subject to the rules, fares, and charges in effect on the date a ticket is issued, determined by the validation stamped or imprinted on the ticket, or valid electronic ticket.

F. Use of Images - Passengers (or in the case of minors, their parents or legal guardians) consent to the unpaid use of any photos, videos, or other images taken of them by or for Frontier, for advertising or marketing purposes.

G. Taxes and Charges - When the ticket is issued for the effective date, all government, airport, vendor, or other charges that apply to passenger travel into foreign countries are the responsibility of the passenger to whom the ticket was originally issued and are in addition to the published fare and charges.

H. Fares/Charges - Specific fares and charges information is available through Frontier reservations offices and at www.FlyFrontier.com.

I. No Class Action - Any case brought pursuant to this Contract of Carriage, Frontier's Tarmac Delay Plan, or Frontier's Customer Service Plan may be brought in a party's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

J. Time Limit for Action - No legal action may be brought by a passenger against Frontier unless commenced within 6 months from the date of the alleged incident.

K. Choice of Law - This Contract of Carriage will be governed by and construed in accordance with the laws of the United States of America and the State of Colorado without regard to conflict of law principles or law. All right to trial by jury in any action, proceeding or counterclaim arising out of or in connection with this Contract of Carriage is irrevocably waived.

L. Codeshare Flights – Except for baggage policies (see section 12. , section 13. , and section 14. ), the policies, rules, and procedures of the operating airline will apply on any codeshare flight.

## 22. Contingency Plan for Extended Tarmac Delays

The safety of our passengers is our #1 priority at Frontier Airlines. With that in mind, Frontier works hard to avoid extended tarmac delay situations. However, occasionally these situations do arise. Frontier maintains a plan to resolve the extended tarmac delays as quickly as possible as well as mitigating the impact and inconvenience to our passengers.

For all flights that remain at the gate or other disembarkation area with the main cabin door open 30 minutes after scheduled departure time (including any revised departure time that passengers were notified about before boarding) from which there is an opportunity to deplane, Frontier will notify passengers that they have the opportunity to deplane from the aircraft and repeat that notice at least every 30 minutes thereafter while that opportunity continues to exist.

A. For all flights that have departed from a gate without taking off or after a flight has landed without arriving at a gate ("Delay"), Frontier will notify passengers of the status of the Delay every 30 minutes while the aircraft is Delayed, including the reasons for the Delay, if known.

B. No later than 120 minutes after a Delay begins, Frontier will ensure that all passengers have been afforded the opportunity to receive food and water, unless the pilot-in-command determines that safety or security considerations preclude such service.

C. At 150 minutes (210 for international flights) after a delay begins, unless the pilot in command deems that departure is imminent, Frontier will look to return the aircraft to a gate or move to a remote parking location where passengers can be afforded the opportunity to deplane.



**CONTRACT OF CARRIAGE** Rev83 04/10/23

D. By no later than 180 (240 for international flights) minutes after a Delay begins Frontier will return the aircraft to a gate or other location where passengers will have the opportunity to deplane, unless:

E. The pilot in command determines there is a safety related or security related reason (e.g., weather, a directive from an appropriate government agency) why the aircraft cannot leave its position on the tarmac to deplane passengers; or

F. Air traffic control advises the pilot in command that returning to the gate or another disembarkation point elsewhere in order to deplane passengers would significantly disrupt airport operations.

G. During any Delay, Frontier will ensure that a comfortable temperature is maintained throughout the passenger cabin.

H. During any Delay, Frontier will ensure access to medical attention is available to meet all requests, including the use of a third-party medical consultation service.

I. During any Delay, Frontier will ensure that operable lavatory facilities are available provided the pilot-in-command determines that it is safe and secure for passenger to move about the aircraft cabin.

J. At each airport where Frontier flies, including diversion airports, this plan has been coordinated with airport authorities, Customs & Border Protection, and the Transportation Security Administration.

K. Frontier has ensured that it has adequate resources available to administer this plan.

Frontier would also like our passengers to be aware of certain the following that will apply in the case of a Delay:

A. If a flight returns to a gate or diverts from its planned destination, in most cases, the delayed or diverted flight will attempt to continue to its final destination. The right to deplane in such cases will be determined in accordance with the above.

B. Frontier maintains information and arrangements with both airports and other airlines to secure additional gate space if needed during a tarmac delay. If allowed by the airport, the deplaning of passengers may take place when it is safe and secure to do so, either at a gate or at an approved remote parking position via stairs and ground transportation.

C. Any passengers who choose to deplane from a flight that has experienced a delay and make alternative travel arrangements may do so when it is determined to be safe and secure, after the aircraft has been moved into position for deplaning, all operational requirements for deplaning have been completed, and the pilot-in-command has allowed customer deplaning to begin.

D. Passengers should be aware that if they choose to deplane, they do so at their own risk and the flight may depart without them. Frontier will make reasonable attempts, e.g., via airport announcements, to communicate the new departure time of the flight. In cases where an aircraft that has returned to a gate, passengers may be advised how long the aircraft will remain at the gate to determine how much time (if any) passengers may spend inside the terminal prior to having to re-board the aircraft for the continuation of the flight. Such time may, however, be shorted in which case an announcement will be made to return to the aircraft.

E. Passengers who choose to deplane and/or make alternative travel arrangements should be aware that on most domestic flights their checked baggage will remain on the aircraft. In cases where a flight returns to the gate and is canceled baggage will be returned to the baggage claim area.

F. In instances where passengers are permitted to deplane at a remote aircraft parking position, reboarding the aircraft may not be possible.